[No. 12277.   Department One.   June 12, 1915.]

HALLIE STEWART et al., Appellants, v. N. O. BALDWIN, as Executor of the Estate of Peter A. Peterson et al., Respondents.[1]

EXECUTORS AND ADMINISTRATORS—SALES—VALIDITY—PURCHASE BY EXECUTOR—CONSTRUCTIVE FRAUD—EVIDENCE—SUFFICIENCY. The executor, by procuring a sale of the real estate to pay debts without giving the court an opportunity to determine the advisability of remortgaging the land, is guilty of a constructive fraud upon the heirs, where it appears that the bulk of the remaining indebtedness was represented by a mortgage for the sum of $1,750; that, upon being advised that he must find a purchaser, he represented that his son, who was just 21 and without means, would buy the property, and cash for the bid was procured by arrangements for a new mortgage, the property was bid in by the son for the appraised value $2,000, and father and son gave a new mortgage for the amount, secured upon the property sold and other property belonging to the father; that the son paid no consideration, made the bid at his father's request, received no part of the rents and profits, and later conveyed

[1]Reported in 149 Pac. 662.

the land to his father without consideration; since, in the absence of statute, an executor may not bid at his own sale, and since the transaction amounted merely to a change of mortgages and transfer of title to the executor; and since, in his fiduciary relation, when he could not sell to any one but himself, equity required and he owed the duty, under Rem. & Bal. Code, §§ 1503, 1505, to allow the court to examine witnesses and determine whether it was for the best interests of the estate to sell or to remortgage the property for the purpose of paying the mortgage indebtedness (HOLCOMB, J., dissents).

SAME—CONSTRUCTIVE FRAUD—NOTICE. A constructive fraud by an executor in indirectly purchasing at his own sale, arises irrespective of his motive or any moral wrong; and the fraud need not be proved by strong convincing evidence, slight circumstances being sufficient in view of his duty as trustee.

Appeal from a judgment of the superior court for Garfield county, Miller, J., entered February 13, 1914, upon findings in favor of the defendants, in an action for equitable relief, tried to the court. Reversed.

*France & Helsell*, for appellants.

*G. W. Jewett* and *Kuykendall & McCabe*, for respondents.

CHADWICK, J.—This case comes to us along with No. 12278, *Stewart v. Fitzsimmons, ante* p. 55, 149 Pac. 659. Jane H. Peterson, the wife of Peter A. Peterson, died in the year 1903, leaving as a part of her estate 120 acres of land which was part of a preemption entered by her husband, Peter A. Peterson. The 120 acres was community property. The estate was indebted to various persons and firms. In November, 1903, Peter A. Peterson, the administrator of his wife's estate, filed a petition praying for the sale of the land, in order to pay the debts of the estate and the expenses of administration. At that time, the bulk of the debts had been paid by the administrator, either out of the property of the estate or on account of advances which, it is now claimed, he made out of his own funds. The bulk of the remaining indebtedness was represented by a mortgage upon the 320 acres to which we have referred in *Stewart v. Fitzsimmons, supra*, for the sum of $1,750, in favor of one D. P. Thomp-

son. The mortgage had been executed by Peter A. Peterson and Jane H. Peterson. Peterson was advised by his attorney that it would be necessary for him to find a purchaser for the land. After a short time, he told the attorney that his son Albert would buy the property. When told that he (Albert) did not have sufficient funds to buy for cash, the attorney advised Peterson to go to a Mr. Campbell and see if an arrangement could not be made to get the money. An arrangement satisfactory to the parties was made, the sale was had, and Albert Peterson was returned as the purchaser.

Mr. Campbell was the local agent of D. P. Thompson, and, also, the local agent of A. W. Ocobock. When the sale had been made and confirmed, a release of the D. P. Thompson mortgage, which then with interest amounted to $1,906, was made. Peter A. Peterson filed a declaration of homestead upon the 200-acre tract and, at the same time, executed a deed to Albert Peterson for the 120 acres. A new mortgage was then drawn in favor of Ocobock to secure a note signed by Albert Peterson and Peter A. Peterson. A mortgage was taken upon the whole 320 acres, the 200 acres which Peter A. Peterson had claimed as a homestead and the 120 acres said to have been purchased by Albert Peterson. Albert Peterson testified that he had no money; and that he bought the land because his father requested him to do so. The 120 acres and the 200 acres, being the original farm of 320 acres, was farmed and used as one tract of land by the family, consisting of Peter A. Peterson and Albert Peterson and three minor children. Albert Peterson testifies that he received no part of the rents, issues and profits of the place. In September, 1905, he reconveyed the property to his father, no consideration passing between them except the assumption of the mortgage debt.

Plaintiffs contend that the sale of the land to Albert Peterson operated as a constructive fraud upon their right to share in the estate of Jane H. Peterson; that, in truth

and in fact, Peter A. Peterson became, through the instrumentality of his son Albert, a purchaser at his own sale, and thereafter held the property in trust for the heirs. Upon this state of facts, the court below held that the administration sale to Albert Peterson was:

"Legally made and fairly conducted, and that the sum bidden and paid was the full value of the property sold and that said sale was *bona fide* and without fraud or collusion between the said Albert Peterson and Peter A. Peterson. That the said sale of Albert Peterson to Peter A. Peterson was a *bona fide* sale, for value, and was without fraud or collusion between the said parties, or at all."

It is true that the land was struck off at the administrator's sale for a sum approximating its value—it had been appraised at $2,000—and we have no doubt that Peter A. Peterson was acting in good faith and with no desire other than to lodge the title in himself freed of the embarrassment of having his property subjected to further administration. It is perhaps unfortunate that our community property laws do not preserve at least a life estate in the survivor instead of forcing the dissolution of a relation to property which has too often resulted in financial sacrifice. We are impressed with the observations of Mr. Woerner in his "The American Law of Administration:" Vol. 2 (2d ed.), footnote, § 334:

"But neither the array of English authorities . . . nor the emphatic indorsement of the doctrine by the Supreme Court of the United States and the authorities there cited, showing the same to be in consonance with the civil law and codes of European countries, quite vindicate it [the rule against trustees purchasing at their own sales] against all misgivings as to its applicability to executors and administrators. The very depth to which the remedy goes, as emphasized by Chancellor Kent, suggests the doubt in its practical wisdom. In uprooting the evil, valuable safeguards to the substantial interests of the parties sought to be protected are destroyed with it. By removing the possibility of a fraudulent acquisition on the part of the executor or administrator the power to protect the interests of beneficial

owners by securing to them the value of their property is
likewise swept away. Frequent instances are within the ex-
perience of judges of probate and practitioners in probate
courts, that the only possibility of rescuing from the other-
wise total sacrifice and wreck of the estate a remnant for the
widow and orphans is to let the widow (if she be, as she
generally is, the administratrix) buy in and keep the prop-
erty, accounting for the price it brought at the public or
private sale. So embarrassing does this deeply cutting doc-
trine operate in some instances, that where, upon the death
of a husband and father, the widow desires to keep the fam-
ily together, and preserve as much of the home and property
belonging to them as is consistent with full justice to the
creditors (and which often amounts to a sufficiency for the
decent support of the family), the widow is reduced to the
necessity of either renouncing her right to administer, or
risking the sacrifice of the property, because the law will not
permit her as administratrix to compete at the sale with
strangers or creditors."

If the sale was a *bona fide* sale to Albert, and the repur-
chase by Peter A. Peterson was made without reference to
the former proceedings, these observations of course are not
apt. But we are of the opinion that the sale was, in legal
effect, a sale to Peter A. Peterson, and that whatever incon-
venience may result to a surviving member of a commu-
nity, the general rule that an administrator cannot buy,
either directly or indirectly, at his own sale must be followed
in the absence of a statute authorizing him to purchase, or
unless some controlling equity intervenes to bar the *cestui que
trust*. Woerner, American Law of Administration, §§ 334,
487; *Davoue v. Fanning*, 2 Johns. Ch. 251; *Michoud v.
Girod*, 4 How. 503; 18 Cyc. 326.

The courts did not make the law vesting title in the heirs
upon the death of an ancestor, nor did they decree that a
child shall take equally with and during the lifetime of a sur-
viving member of a community. Those rights depend upon
legislative enactment, and our statutes give to a surviving

child an immediate interest of which the courts must take
notice.

An administrator stands in a fiduciary relation to those
beneficially interested. He is subject to the universal rule
that a trustee is bound to do that which will best serve the
interests which for the time are intrusted to his care. His
own good faith is not enough.

A somewhat similar transaction was had in the case of
*Dormitzer v. German Sav. & Loan Soc.*, 23 Wash. 132, 62
Pac. 862:

"It may be conceded that there was no intention—and we
think that is a fact—on the part of the attorneys, the pro-
bate judge, Tull, and the respondent, to injure the appel-
lants, and that they acted from the best of motives; but the
fact stands out, nevertheless, that they perpetrated in law
a fraud upon the children."

Now, what did equity require of the administrator? He
had a right to petition the court for a sale of the property,
but when it became apparent to him that a sale could not
be made except to himself or through the intervention of his
son, who acted entirely under his direction and advice and,
in part at least, upon his credit and the credit of his own
land, and that the net legal result of the proceeding to sell
was to change the form of the mortgage debt which was the
basis of his petition to sell, equity required of him that he
report that fact to the court and take an order allowing him
to remortgage the property, for the statute under which he
was proceeding provided for the mortgage of property as
well as its sale.

The law enjoins the sale of land belonging to estates of
deceased persons with reluctance, and while it may be an
irregularity to sell where a mortgage should have been
made, which is cured by confirmation—that question is not
before us—the statute clearly implies that the court shall
have an opportunity to pass upon the question whether the

property shall be mortgaged or sold. Rem. & Bal. Code, § 1503, provides for notice, a hearing and the examination of witnesses.

Section 1505 provides:

" . . . the court shall then proceed to determine which method of raising such funds will be most beneficial to the estate and those interested therein, and shall thereupon make an order authorizing the executor or administrator to sell the whole or so much and such parts of the real estate described in the petition as the court shall adjudge necessary or beneficial, or authorizing the executor or administrator to mortgage the whole or so much and such parts of the real estate described in said petition as the court shall adjudge necessary or beneficial, according as the court shall determine one or the other methods most beneficial to the estate and those interested therein."

The petition in this case makes no reference to, nor did the court have an opportunity to pass upon, the advisability of remortgaging the land to take up the D. P. Thompson note and mortgage. We are assuming that it was necessary to raise money to pay off the D. P. Thompson mortgage in March, 1904. It is suggested rather than asserted by counsel for respondents, although it is not entirely clear that it is so.

This court has consistently held trustees and agents acting in a fiduciary capacity to the rule of strict accountability. In *Coughlin v. Holmes*, 53 Wash. 692, 102 Pac. 772, we held that a sale by a county treasurer to himself or his deputy was against public policy and void. In *Roger v. Whitham*, 56 Wash. 190, 105 Pac. 628, 134 Am. St. 1105, we held that a city attorney could not bid in property at a sale conducted by him and assert equitable defenses against the owner. In *Miller v. Winslow*, 70 Wash. 401, 126 Pac. 906, Ann. Cas. 1914 B. 833, a sale by a sheriff to himself was held to be invalid.

The facts upon which we base our opinion that the sale was constructively fraudulent as to the heirs of Jane H.

Peterson are that the administrator did not in law or equity sell the property at all, but with his son Albert gave his own note and mortgage to secure the payment of the same debt to another mortgagee. While it is asserted that this amounts to an actual cash transaction, as a matter of fact it was, to the extent of $1,750, a mere matter of bookkeeping by the agent of the mortgagees—the old and the new. This result might have been accomplished without passing the title through his son Albert. Albert was a boy just passed twenty-one, and it is not shown that he had any independent means, nor is it shown to our satisfaction that he thereafter exercised that dominion which suggests ownership. "It was understood" that the property was Albert's, "It was treated and regarded" as Albert's, that Albert "did the bossing," are terms altogether too general to base a finding upon, especially when considered in the light of the fact that Albert, some time after the sale back to his father, had the land rented, and the further fact that this showing, such as it is, depends upon the testimony of those to whom the property of Peter A. Peterson was bequeathed and devised, to the exclusion of the children of Jane H. Peterson by her first husband. The fees for the recordation of the mortgage and other instruments entering into the transaction between father and son were charged to and paid by the estate. The land was resold for no consideration other than the assumption of the very debt which the old mortgage was given to secure. It would do violence to credibility to say that it was a new debt because it had been underwritten by Mr. Ocobock. This alone was held to be controlling in *Boynton v. Brastow*, 53 Maine 362. It is there said:

"It is enough, however, for us to know that the property was redeeded to one of the trustees for the same consideration for which it was sold, before his duties as trustee were ended. Equity will not permit a trustee thus to deal with the trust property, except for the benefit of the *cestui que trust*. Sound policy requires all the skill and efforts of a trustee to be used for the benefit of the *cestui que trust*;"

Counsel seek to sustain the sale by urging upon our attention the fact that the mortgage to Ocobock was for the sum of $1,700, whereas the sale was returned at $2,000, the appraised value of the land, and that we must assume that Albert contributed at least $300, and if we do, this would sustain the sale. Albert testified that he paid no money. This statement is not impeached by the testimony of any witness or by any collateral circumstance. If we are to indulge in presumptions, it would seem rather that the father met this difference. It is a fair inference that, if he could find money to pay obligations of the estate, aggregating about $1,300, out of his own pocket, that he could find enough to make up the difference between $1,700 and the $2,000 returned by him as the price for which the land was sold.

Respondents assume that appellants cannot recover unless we believe the testimony of Albert Peterson, and that he is unworthy of belief because,

(a) He has shown a vindictive character, in that he testified that his father at one time took four horses and a wagon and deserted the family—was gone a year. We do not regard this testimony as vindictive or as tending to blacken the character of his father. The conclusion drawn from the facts testified to is not evidence and we have endeavored to disregard it entirely.

(b) Because Mr. Start, who made out the deed from Albert to his father, testified that Albert said he was owing his father and made the deed in settlement of all sums owing by him. Mr. Start's recollection is not sufficiently clear to overturn the presumption attending the transaction. As we read his testimony, he tried to frankly admit that he had no memory of any conversation. He said:

"Q. You may state if you have any memory of the execution of that deed. A. I know that I acknowledged the deed, but I cannot state definitely whether I drew the deed. The party signing the deed acknowledged it before me and I also

witnessed the deed, but as to drawing it I could not state definitely. I presume, though, that I did. Q. Do you remember any conversation at that time by and between Albert Peterson and his father in regard to the consideration for that deed? . . . A. Regarding the consideration, you say? Mr. Jewett: Yes. A. No, I don't know that I remember anything further than they gave me the consideration of the deed. Q. What did they give you as the consideration? A. The consideration was $5,000 stated in the deed. Q. Was there any conversation between them and you at that time? Mr. Jewett: Q. In regard to —I don't want to be leading—any indebtedness? A. To the best of my recollection there was some conversation between them to the effect that this deed was being given in payment of some obligation between them or some difference. Q. Was it your understanding of the conversation that settled up the account between Albert Peterson and P. A. Peterson at that time? A. That was my recollection of the conversation. Mr. Jewett: Q. Now, this mortgage . . . How much was that mortgage? A. I believe the mortgage was $1,700. (Cross examination.) Q. Do you recall this conversation clearly, or the other one? You say to the best of your recollection. I want to know how clear your recollection is. A. That is as near as my memory serves me. Of course I cannot remember back to 1905, that long a time. Q. There was nothing about this transaction to call your mind any different than any other transaction? A. No, I think not. Q. You don't know what was said, the words? A. Not the exact words, no."

(c) That it would have been impossible for Peterson, unlettered and unlearned as he was, to conjure and work out a fraud without the knowledge of his attorney, who is admittedly free of any wrongdoing.

This contention might have some weight if we found that there was a designed fraud. We do not think there was actual fraud or intent to defraud. Constructive fraud may arise however free from ulterior design the mind may be. Constructive fraud is a legal inference; a conclusion which arises, not from the facts admitted or proven alone, but when such facts are considered in connection with a legal

relation, a duty imposed by law. We find nothing in this case to justify the belief of counsel that this case is an assault upon the character of Peter A. Peterson. He evidently thought he was acting within the law. Equity does not measure legal rights by thoughts. It takes account of the consequences of human conduct. It may be admitted that Peter A. Peterson was guilty of no moral wrong.

"A constructive fraud has been said to be 'an act which the law declares to be fraudulent, without inquiring into its motive; not because arbitrary rules on this subject have been laid down but because certain acts carry in themselves an irresistible evidence of fraud." 20 Cyc. 9.

See, also, *Roger v. Whitham, supra; West v. Waddill,* 33 Ark. 575; *Huston v. Cassedy,* 13 N. J. Eq. 228.

The logic of our previous holdings is that it is not enough that the act of a fiduciary shall be free from moral wrong; his act must be above suspicion. The rule in such cases is not as contended by counsel, that a fraud must be proved by evidence, strong, cogent and convincing, but having in mind the duty imposed upon the trustee that "slight attending circumstances are enough to prompt the discretion of the chancellor." *Roger v. Whitham, supra.*

In 1909, Peter A. Peterson sold his 200-acre homestead and the 120 acres to Omer Fitzsimmons, taking his notes for $16,000. These notes were secured by mortgage on the land. The sale to Fitzsimmons is not in question. It follows that plaintiffs are entitled to their proportionate share of the rents, issues and profits of the land from the time the administrator was discharged, up to the time the land was sold to Fitzsimmons, approximately five years, and to their proportionate interest in the notes given by Fitzsimmons in payment for the 120 acres. The rents, issues and profits of the land have not been shown with sufficient definiteness to warrant a decree for any certain sum. We may assume that the earnings of the land cannot be definitely shown. This being so, plaintiffs are entitled to their proportionate share

of the fair rental value, which from the conflict of the evidence we find to be $2 per year upon each acre, for five years.

The decree of the lower court is reversed, and the cause remanded with instructions to enter a decree in accordance with this opinion.

MORRIS, C. J., PARKER, and MOUNT, JJ., concur.

HOLCOMB, J. (dissenting)—I dissent: The evidence shows that, although Peter A. Peterson acquired the land from his son Albert, Albert had acquired the same through a necessary, fair and open administrator's sale, during the administration of his mother's estate, about the end of the year 1903; that he thereafter had used and managed the land as his own, until September, 1905, when his father repurchased it from him for an adequate consideration. Thus, it seems, he acquired title in himself exactly the same way and to the same extent as if he had purchased a tract that had never been a part of his deceased wife's estate, and from an entire stranger thereto. In such case it would be her separate estate, and so I think it should be held in this case. There was neither actual nor constructive fraud upon the heirs.