[No. 29004. Department One. August 25, 1943.]

MAUDE F. RYAN, *Appellant,* v. FRED B. PLATH *et al.,
Respondents and Cross-appellants.*[1]

[1]Reported in 140 P. (2d) 968.

*D. V. Morthland* and *Lane Morthland,* for appellant.

*Velikanje & Velikanje,* for respondents and cross-appellants.

STEINERT, J.—This was an action to establish a constructive trust in respect of certain real and personal property; to compel restitution of the lands and chattels involved therein; and to obtain an accounting of all assets, income, and accruals acquired or derived by the alleged corporate constructive trustee and its principal officer during the period in which they respectively had held, managed, and operated the property and the industry in which the property was used.

The action was tried as an equity case before the court without a jury. At an initial hearing on the merits, the court first determined that the acts of the defendants established a constructive trust for the benefit of the plaintiff and her assignors and then ordered a full accounting by the defendants. There-

after, another hearing was had before the court upon the account so rendered and the exceptions thereto by the plaintiff. At the conclusion of the final hearing, the court made findings, from which it drew certain conclusions, and thereupon entered a decree establishing the right of ownership of the property in the plaintiff; settling the account of the defendants as of a certain date; and determining the amount, as shown by the result of the accounting, which plaintiff should pay into the registry of the court as a condition upon which she would be let into possession of the property and thereafter have a further accounting for the period subsequent to the time of the latter hearing.

The plaintiff appealed from that portion of the decree which was adverse to her, and the defendants in turn cross-appealed from that portion which was unfavorable to them. We shall hereinafter refer to the plaintiff as appellant, and to the defendants as respondents.

This litigation grows out of the administration of the estate of Delbert J. Foster, a bachelor, who died intestate in Yakima county in 1931. For many years prior to his death, Foster had operated a farm in that county consisting of approximately forty acres, of which thirty-two acres were in orchard. The land, together with certain farm equipment and other personal property thereon, was held under an executory contract entered into on October 6, 1919, by one James D. Bean, as seller, and Nettie L. Kneebs, Edward J. Preece, and Delbert J. Foster as purchasers. The purchase price stated in the contract was $20,500, of which $2,000 was paid in cash, and the balance of $18,500 was to be paid out of the annual gross receipts from the crops. On July 2, 1923, that contract was replaced by another contract between the same parties, reciting the purchase price as $15,350, of which $5,000 was to be paid by the assumption of a mortgage in that amount then held by a mortgage and loan company, and the balance

of $10,350 was to be paid by the semi-annual applica-
tion of the *net* receipts from the products grown and
harvested on the land. The respective interests of
Preece and Kneebs in the second contract were there-
after conveyed or assigned by them to Foster at times
on or before January 9, 1926.

· Prior to the death of Foster, James D. Bean had
passed away, and upon the administration of his estate
the Guaranty Trust Company of Yakima became the
holder of the legal title to the real estate described in
the contract, in trust for the heirs of Bean.

Delbert J. Foster died April 6, 1931, leaving as his
heirs at law W. O. Foster, a brother residing in Chicago,
Illinois, Bert E. Foster, a brother residing in Minne-
apolis, Minnesota, and Maude F. Ryan, appellant here-
in, a sister by adoption, residing in Sioux City, Iowa.
A short time prior to the commencement of this action
on April 8, 1941, the two surviving brothers assigned
to the appellant all their interest and claim in and to
the estate of the deceased.

Upon receipt of notice of the death of Delbert J.
Foster, appellant and her brother Bert proceeded to
Yakima to attend the funeral. Appellant had visited
her brother Delbert the year before his death and at
that time had become acquainted with respondent
Fred B. Plath, president and general manager of re-
spondent Washington Fruit & Produce Company, a
corporation engaged in packing, storing, and selling
fruit and produce in Yakima. Plath owned fifty-eight
per cent of the capital stock of the corporation, and
the remaining capital stock was owned by two other
individuals associated with him in the business. For
approximately eight or ten years prior to 1931, the
Washington Fruit & Produce Company had handled
the fruit and produce grown and harvested by Foster
on his farm.

After the funeral, the appellant and her brother
Bert requested Plath to act as administrator of their

deceased brother's estate, and after much persuasion Plath consented to do so. Probate proceedings were thereupon commenced on the petition of appellant and Bert E. Foster, and at their request Plath was appointed and qualified as administrator on April 27, 1931.

On July 1, 1931, the administrator filed an inventory and appraisement of the estate showing real estate consisting of the farm valued at $23,750 and personal property valued at $1,250, or a total appraised value of $25,000. At the time of the death of Delbert J. Foster, there were in cold storage at the plant of Washington Fruit & Produce Company 3,882 boxes of Winesap apples belonging to the estate which were not listed in the inventory. These apples were later sold for $4,351.80. Plath testified upon the trial that this amount was included in an account and report filed by him on October 6, 1933, although the specific amount does not appear in that report as a separate, distinct item.

The record discloses that at the time of Delbert J. Foster's death the financial situation with respect to the farm and the real estate contract involved was this: The Guaranty Trust Company held the legal title to the property in trust for the heirs of James D. Bean, deceased; the equity of the Bean heirs under the contract was $7,000; the trust company, as trustee for one Chrysler, also held a mortgage on the land in the principal sum of $5,000; there was thus a total indebtedness of $12,000, for which the land was security. Up to that time, however, all requirements of the contract except the payment of taxes for 1930 had been met.

On October 30, 1931, the above mentioned Nettie L. Kneebs filed with the administrator two claims against the estate aggregating $11,685 with interest, represented by two promissory notes purportedly signed by Delbert J. Foster. The administrator rejected both of

these claims, and thereafter on December 18, 1931, Miss Kneebs brought suit against him seeking to have her claims allowed. On January 9, 1932, the administrator responded to her complaint by an answer in the form of a general denial, but he did not file it until December 4, 1936. On December 12, 1936, that action was dismissed with prejudice, for want of prosecution. The significance of those claims and of the manner of their ultimate disposition, as bearing upon the present controversy, will appear a little later herein.

Plath, as administrator, operated the farm during the period between April 27, 1931, and October 14, 1936, comprising the greater portion of six "fruit" years. These operations were conducted with the knowledge and consent of the heirs of the estate.

In the beginning, the estate had but little money and only a small amount of personal property that could be converted into cash. The heirs at no time advanced any funds to the administrator. The only source of revenue for conducting the operations therefore was the receipts from the sales of fruit and such advances as the Washington Fruit & Produce Company, the packer, would make from time to time. Concededly that was the method under which Foster had operated the farm during his lifetime.

At any rate, Plath, the administrator, set up in the books of the Washington Fruit & Produce Company, of which he was the president, manager, and principal stockholder, an account in the name of the Delbert J. Foster estate. In this account he credited the small amount of cash on hand at the time of Foster's death, also $600 received from the sale of an automobile, and the proceeds of the sales of fruit produced from year to year. Against these he charged the expenses of operating the farm, including labor, material, and the cost of improvements, and also the expenses of transporting, packing, storing, and selling the fruit. As the fruit was harvested from year to

year it was hauled to the plant of the Washington Fruit & Produce Company in Yakima, where it was washed, packed, stored, shipped, and sold in the usual manner. For the services rendered by the produce company in handling and marketing the fruit, the estate was charged upon the same basis as were other producers with whom the company regularly did business.

Unfortunately the operations of the farm were not successful from a financial point of view during the six-year period to which we have just referred. In only one of those years was there a profit, shown as a credit balance in the account of the estate. According to the record, this condition of affairs was due to a steady run of unfavorable weather and market conditions. The result was that on September 26, 1936, the debit balance owing by the estate to the Washington Fruit & Produce Company amounted to $3,594.84. There is no evidence in the record that these losses were due to any fault or neglect on the part of the administrator in his operation of the farm, nor is there any evidence that there would have been a profit had the farm been operated by some other person or in some other manner.

During this six-year period, considerable correspondence took place between the administrator and the heirs, who lived in the middle west, and it appears from the letters in evidence that the heirs were kept informed of the unfavorable weather and market conditions which prevented the realization of any profit except for the one year. The correspondence also reveals that there was some attempt during this period to sell the property. Only one offer was received, however, but the appellant herein, who seemed very hopeful of ultimate substantial returns, was unwilling to sell at the price offered. Nothing further came of those attempts to dispose of the farm.

By spring of 1936 the fixed indebtedness of the estate had risen from the original amount of $12,000

heretofore mentioned, to approximately $17,300. Of this latter amount, $9,600 was owing on the contract, $5,700 on the Chrysler mortgage, and something over $2,000 for delinquent taxes, irrigation construction charges, and maintenance assessments. In addition to this total fixed indebtedness, there were the Kneebs claims of $11,685, which were then still pending in the form of an undisposed-of suit.

Becoming alarmed at this condition of affairs, the Guaranty Trust Company, trustee for the James D. Bean heirs and for the holder of the Chrysler mortgage, concluded that something would have to be done to protect the equities of the beneficiaries under the trusts. The trustee thereupon sought to interest various persons in purchasing the farm. To that end it offered to sell the property, or rather its interests therein, for $12,000, then for $11,000, and finally for approximately $9,000.

The only parties whom the trustee was able to interest at all in such sale and purchase were Plath, the administrator, and the Washington Fruit & Produce Company, of which Plath was the president, manager, and principal stockholder. Negotiations with these parties were conducted along the line above noted over a period of three or four months. Plath and his company, however, were not attracted by the proposition until the low offer of approximately $9,000 was made sometime prior to September 23, 1936. During that month the parties did reach an understanding in which the trustee agreed to sell, and the Washington Fruit & Produce Company through Plath, agreed to purchase, the property, including the real estate, the 1936 season's fruit, and the personal property on the land, for $9,187.84. Apparently one of the reasons that impelled the Washington Fruit & Produce Company to purchase the property was the fact that the estate then already owed it $3,594.84 on account of advances made by it for the operations during prior years; by pur-

chasing the property, the company stood a chance of recouping its loss, which was otherwise unsecured.

The question then arose as to how the prospective sale and purchase could and should be consummated. The plan that apparently was agreed upon, at least the one that was pursued, took the following course: On October 1, 1936, the administrator Plath filed with the clerk of the court a document labelled "Account And Report of Administrator And Petition"; the next preceding report had been filed October 6, 1933. The report of October 1, 1936, set forth the original appraised value of the estate, the amount of claims approved, the rejection of the Nettie L. Kneebs claims amounting to $11,685, the commencement of an action thereon by Miss Kneebs, and the pendency of that action *at that time.* The report then recited that the total debit balance of the estate, represented by advances made by Washington Fruit & Produce Company, amounted to $3,594.84. Further, the report showed that the estate then owed $9,608.62 on the contract, $5,700 on the mortgage, and $2,642.18 for taxes and water charges, or a total of $17,950.80 actual indebtedness. These recitations were followed by the statement that there was no equity in the property for the creditors, and concluded with a prayer that the property be reappraised, that the administrator Plath be permitted to abandon the contract and relinquish the property to the vendors therein, that the administrator be discharged from the necessity of further administration, and that the estate be closed.

An order was entered fixing October 13, 1936, as the day for hearing the report and petition, and at the same time appointing three appraisers to reappraise the property of the estate. Notice of the hearing was posted in three public places, and copies of the notice and of the report and petition were mailed to each of the heirs and unpaid creditors, including Nettie L. Kneebs. The real estate was immediately reappraised

at $10,000, but no appraisement or mention was made of the personal property then on hand, or of the 1936 crop which had then been harvested.

After a hearing before the court commissioner on the day fixed, an order was entered on October 14th approving the report and granting the administrator leave to surrender the contract of purchase of the real property to the owners of the legal title thereof. Following this, on October 29, 1936, the administrator filed his "Final Account And Petition For Discharge," reciting his surrender of the contract pursuant to the order of October 14th; stating further that there was no other property belonging to the estate; and praying that a final hearing be had and the administrator discharged. An order was thereupon entered fixing November 27, 1936, as the day for such hearing. Notice of that hearing was posted and published as required by statute. On November 27th, the hearing was, by order of the court commissioner, postponed to December 28, 1936. At the time the order of postponement was entered, the Kneebs claims referred to above were still pending in suit.

In the meantime, on November 13, 1936, the Guaranty Trust Company, as trustee for the James D. Bean heirs, sent by registered mail to Plath, as administrator, and to each of the heirs of the Foster estate, a thirty-day notice in writing of forfeiture of the contract for failure to pay several years' taxes, irrigation construction charges, and water assessments on the land, and for failure to pay anything whatever on the contract, principal or interest, since 1930.

Thereafter, on December 12, 1936, after personal service upon Nettie L. Kneebs and upon her attorney of a motion to dismiss her action against the administrator for want of prosecution, an order to that effect, with prejudice, was entered by the court.

On December 24, 1936, the Guaranty Trust Company, as trustee, executed its deed conveying to Wash-

ington Fruit & Produce Company the real estate here involved upon an expressed consideration of $9,000, although the actual amount paid was $9,197.84. The deed was not delivered, however, until four days later.

Then, on December 28, 1936, the day set for the final hearing, an order was entered by the court commissioner approving the administrator's final account, closing the estate, and discharging the administrator. On that same day, after entry of the order, the deed referred to above was filed for record.

During the period between spring and fall of 1936, while the negotiations and transactions between the Guaranty Trust Company on the one hand, and Plath and the Washington Fruit & Produce Company on the other, were in progress, there was an exchange of many letters between Plath and appellant and her husband. On August 17, 1936, Plath wrote a letter to appellant giving his opinion as to price prospects for that year's fruit; he said nothing, however, about the negotiations in progress at that time. As stated before, the administrator sent to appellant and her two brothers copies of the report filed October 1, 1936, which showed existing indebtedness against the land amounting to more than $17,000, also the deficit balance of $3,594.84 owing to Washington Fruit & Produce Company, and the pendency of the Kneebs claims amounting to $11,685. Pursuant to the receipt of that information, appellant on October 8, 1936, wrote to Plath suggesting a delay of the proceedings for abandonment of the contract; by reply of October 15th, which was the day after the order for abandonment had been obtained, Plath advised appellant that such action had not been delayed because the heirs of the Bean estate for a number of years had been pressing for a conclusion of the affairs of the Foster estate and recently had threatened foreclosure unless the matter was cleared in some other way. However, in none of his letters nor in any other way did Plath

ever inform appellant or her two brothers that the Washington Fruit & Produce Company was negotiating for the property or had lately purchased it; nor did he inform her of the fact that the trustee had agreed to reduce the amount of indebtedness against the land from $15,300 to approximately $9,000, or that the Kneebs claims and suit had been dismissed with prejudice. In other words, appellant and her brothers were under the belief that the trustee was asserting its claims for the entire $15,300 and that the Kneebs claims were at least still of possible validity, whereas, in truth the Washington Fruit & Produce Company was negotiating for, and got, the property for $9,197.84, plus the amount of the delinquent taxes, charges and assessments.

Upon the conclusion of the evidence down to this point, the trial court rendered an oral opinion declaring (1) that the purchase of the property by the Washington Fruit & Produce Company in the manner above described created a constructive trust of the property for the benefit of the Foster estate and the heirs; (2) that an accounting should be made by the respondents of their operation of the property from December 28, 1936, until the time of trial, including the disposition of the 1936 crop; (3) that the deficit of $3,594.84, representing unpaid advances made by the Washington Fruit & Produce Company to the estate from 1931 to September 26, 1936, should be credited to the company by charging that amount against the real estate; but (4) that the final order discharging Plath as administrator was *res judicata* precluding further inquiry by appellant into any of the administrator's transactions prior to the entry of that order.

On July 18, 1942, respondents filed a lengthy account, consisting of eighty-eight typewritten pages and arranged in schedules, showing in detail the amounts received and the amounts expended by the Washington Fruit & Produce Company during the

period of its alleged ownership. Appellant filed exceptions to the account, and a further hearing thereon lasting five days was then had before the court.

At the conclusion of the evidence with reference to the account, appellant offered to prove by several witnesses the rental value of the property in question during the period from 1936 to 1942, inclusive, but the court refused to admit that evidence. Appellant also moved for a continuance of the hearing until the harvesting of the 1942 crop was completed, but that motion also was denied.

Later, the court made findings of fact and conclusions of law and entered the decree from which this appeal is taken. In the findings, the court charged the appellant with the following items and amounts: (1) the amount paid by the respondents for the property, $9,197.86, together with interest thereon at the rate of six per cent per annum from December 28, 1936; (2) all taxes, water charges, and the cost of equipment, new trees planted, fire insurance, improvements, and repairs, made or paid for by respondents; and (3) the deficit of $3,594.84 already explained above; or a sum total of $24,734.71. From this amount the court deducted, in its findings, the sum of $3,098.91, profits for 1936, leaving a balance of $21,635.80 owing by appellant to respondents.

In its decree, the trial court adjudged that appellant was entitled to the possession of the real estate together with the personal property here involved upon payment into the registry of the court within ninety days from and after September 23, 1942, the specified sum of $21,635.80.

We now take up the questions presented on the appeal and the cross-appeal. These we shall consider in their natural and chronological order, regardless of whether they have been raised by the appellant or by the respondents.

First, we shall consider respondents' motion, made

in this court, for an order dismissing the appeal of the appellant, on the ground that the questions presented by that appeal are now moot and unnecessary to be decided.

The final decree entered by the trial court provided that if the appellant should conform to its terms by paying into the registry of the court the sum of $21,635.80, as ordered, the deposit should remain there until a final accounting of the *1942* crop had been rendered by the respondents; that, upon the rendition of such account, appellant would be given title to the real and personal property referred to above; that, if appellant did not make such deposit as directed, her action would be dismissed; and that, if respondents in turn failed to perform the decree by executing a proper conveyance of the property to appellant upon payment by her of the designated amount and after final accounting by respondents, the clerk of the court was by the decree appointed and authorized as commissioner to execute such conveyance.

On motion of appellant, the trial court fixed the amount of the cost bond on appeal at $200 and that of the supersedeas bond at $5,800, the right to give such bonds to be available to either appealing party. Appellant gave timely notice of appeal and filed the required cost bond but did not give a supersedeas bond. Respondents now contend that in the absence of a supersedeas bond there was no stay of proceedings, and that by the lapse of time and the failure to give such bond the decree has become fully executed in favor of respondents, and all questions pertaining thereto have become moot.

In our opinion the respondents have mistaken the effect of a supersedeas bond and of the failure to give one as prescribed by the trial court. The purpose of a supersedeas bond is to stay further proceedings in the superior court (Rem. Rev. Stat., § 1722 [P. C. § 7296]), and the failure to give such bond sim-

ply permits the enforcement of the judgment or decree by execution, attachment, garnishment, contempt proceedings, or some other appropriate form of process. Failure to supersede a judgment or decree, however, in no way affects the right of the appealing party to obtain review of the proceedings which led to such judgment or decree. *Nixon v. Boling*, 145 Ala. 277, 40 So. 210; *Willey v. Hoggson*, 89 Fla. 446, 105 So. 126; *People ex rel. McKnight v. Chicago Title & Trust Co.*, 266 Ill. 224, 107 N. E. 198; *Cameron v. White*, 128 Okla. 251, 262 Pac. 664; *Ada Milling Co. v. George*, 169 Okla. 278, 36 P. (2d) 736; *Larson v. Munson*, 37 S. D. 182, 157 N. W. 318; 5 Bancroft's Code Pleading, Practice and Remedies (10 yr. supp.) 4187, § 6585.

If, at the time of the entry of the decree, there was anything therein that could be superseded, the failure of the appellant to file a supersedeas bond left the respondents entirely free to take any action originally permissible under the decree, but it would not entitle them to a dismissal of the appeal. However, in this instance, supersedeas would have had no effect whatever on the *status quo* of the proceedings or of the property affected thereby, because both the real property and the personal property have been, since December 28, 1936, and still are, in the possession of the respondents themselves, and their possession would not be altered by the execution of a supersedeas bond.

Furthermore, the decree was not self-executing, because, as appears above, several contingencies remained to be determined, and further action had been indicated by the court to deal with different situations as they might thereafter arise. Added to all this is the fact that one of the principal questions involved in the main appeal is whether or not the trial court erred in requiring the preliminary deposit of $21,635.80 by the appellant. The motion to dismiss the appeal is denied.

Upon the merits, the first question to be considered

arises upon appellant's assignment of error directed to the action of the trial court in holding that the appellant could not inquire into the acts and doings of the respondent Plath while he was administrator, and in refusing to require him to render an accounting of his administration. This attempted inquiry related to the period prior to the final decree closing the estate and likewise prior to the time of the sale of the property to the Washington Fruit & Produce Company.

 Appellant recognizes the settled law in this state that orders and decrees of distribution made by superior courts in probate proceedings upon due notice provided by statute are final adjudications having the effect of judgments *in rem* and are conclusive and binding upon all persons having any interest in the estate and upon all the world as well. See the following recent decisions of this court upon this question, and the many prior decisions cited therein: *Farley v. Davis*, 10 Wn. (2d) 62, 116 P. (2d) 263; *Castanier v. Mottet*, 14 Wn. (2d) 615, 128 P. (2d) 974; *In re Christianson's Estate*, 16 Wn. (2d) 48, 132 P. (2d) 368. .

 To this general rule there is an exception, upon which appellant relies, to the effect that such decrees may be attacked, even in a collateral proceeding, for fraud. See *Meeker v. Waddle*, 83 Wash. 628, 145 Pac. 967; *In re Nilson's Estate*, 109 Wash. 127, 186 Pac. 268; *In re Nielsen's Estate*, 198 Wash. 124, 87 P. (2d) 298; *Farley v. Davis, supra*. However, in such situations the fraud relied upon must be extrinsic or collateral to the issues tried in the original proceeding, that is to say, the fraud on the part of the prevailing party must have been such as deprived the unsuccessful party of a fair hearing upon the original controversy. As stated in the *Farley* case:

"Moreover, when fraud is alleged as the basis for collateral attack upon a judgment or decree, the fraud alleged and sought to be established must be extrinsic or collateral to the issues tried in the proceedings which are attacked, or, as sometimes stated, there must

have been fraud in procuring the original judgment or decree [citing cases].

" 'Extrinsic or collateral fraud,' justifying equitable relief against a judgment or decree, means some intentional act or conduct by which the prevailing party has prevented the unsuccessful party from having a fair submission of the controversy [citing cases]."

■ The alleged extrinsic fraud which the appellant now relies upon is that the respondent Plath, by letters and by allegations in his petition for abandonment of the property, concealed the true state of affairs respecting the financial possibilities of the estate and the pending negotiations with the Guaranty Trust Company, and thereby led the heirs to believe that it was futile for them to pay any further attention to the administration of the estate.

As will appear a little later, Plath's conduct in that respect has an important bearing upon the question of the creation of a constructive trust resulting from the purchase of the property by the Washington Fruit & Produce Company. For the present, however, we are dealing solely with the question of the effect of Plath's conduct upon the right of the appellant in a collateral proceeding to attack the final decree in the probate cause wherein Plath was discharged as administrator. Upon this latter question, the inquiry is whether Plath's conduct must now be regarded as a matter involved in, or intrinsic with respect to, the issues determined in the probate cause, or whether, on the contrary, it is to be considered as extrinsic, or collateral, to such issues.

If there were any fraud in the administrator's *management* of the estate property, such fraud would be intrinsic in, not extrinsic to, the order discharging the administrator and closing the estate. However, as has already been stated, there is no evidence in this case of any mismanagement by the administrator during the course of his operation of the estate property down to the time that the property was sold to the Washing-

ton Fruit & Produce Company. Moreover, the heirs had due notice of the hearing upon the final account and petition for discharge, and it was incumbent upon them to appear at the hearing and raise any objections which they might have had to the account or the doings of the administrator as such. They were in no way prevented from attending that hearing or presenting their objections, and hence the final decree is *res judicata* of the matters involved therein. The trial court did not err in refusing to permit appellant to inquire into the acts and doings of the administrator while acting in that capacity as the operator of the property of the estate.

The next assignment of error is put forward by the respondents, who contend that the court erred in holding that a constructive trust had been created by the sale and purchase of the estate property in the manner described above.

This phase of the case should not be confused with the matter previously discussed under appellant's first assignment of error. The prior matter had relation to the acts and doings of the administrator in his *management and operation* of the estate property down to the time of the sale. Here, we are considering solely the propriety and effect of the sale itself, separate and distinct from the preceding acts of administration and management.

Upon this assignment, the respondents argue (1) that the administrator owed no duty to the heirs to advise them that they could go upon the open market with their own money and purchase the property at a reasonable valuation; (2) that the property was purchased with individual funds, not with funds belonging to the estate; (3) that the surrender of the estate property to the Guaranty Trust Company was due and proper; (4) that the reasonable market value was paid for the property; (5) that the appellant has never tendered to the respondents the purchase price paid by

them for the property; (6) that the corporation which actually purchased the property was not the *alter ego* of the administrator, Fred B. Plath, and had no interest whatsoever in the administration of the estate; and (7) that this action is barred by the running of the statute of limitations.

■ The relation of an administrator to the estate and to those whom he represents is at all times one of trust and confidence, and in his dealings with the estate and its assets he acts throughout in a highly fiduciary capacity. He is required to act with utmost good faith in all of his actions and deeds. This court, in the case of *Stewart v. Baldwin,* 86 Wash. 63, 149 Pac. 662, declared the rule as follows:

"An administrator stands in a fiduciary relation to those beneficially interested. He is subject to the universal rule that a trustee is bound to do that which will best serve the interests which for the time are intrusted to his care. His own good faith is not enough."

■ Courts of equity have always scrutinized closely any transaction, or series of transactions, whereby an administrator, or former administrator, becomes possessed, either directly or indirectly, of property formerly belonging to the estate. One of the most common situations illustrating this is where an administrator or trustee buys property, without the knowledge or consent of those beneficially interested, at a judicial, public, or private sale. In 3 Pomeroy's Equity Jurisprudence (5th ed. 1941) 805, § 958, the following is stated:

"The rule is inflexibly established that where, in the management and performance of the trust, trust property of any description, real or personal property, or mercantile assets is sold, the trustee cannot, without the knowledge and consent of the *cestui que trust,* directly or indirectly become the purchaser. Such a purchase is always voidable, and will be set aside on behalf of the beneficiary, unless he has affirmed it, being *sui juris,* after obtaining full knowledge of all the facts. It is entirely immaterial to the existence and operation

of this rule that the sale is intrinsically a fair one, that no undue advantage is obtained, or that a full consideration is paid, or even that the price is the highest which could be obtained. The policy of equity is to remove every possible *temptation* from the trustee. The rule also applies alike where the sale is private, or at auction, where the purchase is made directly by the trustee himself, or indirectly through an agent, where the trustee acts simply as agent for another person, and where the purchase is made from a cotrustee."

See, also, *Stewart v. Baldwin, supra; Earll v. Picken,* 113 F. (2d) 150; *In re Mountain States Power Co.,* 118 F. (2d) 405; *Batson v. Etheridge,* 239 Ala. 535, 195 So. 873; *Meade v. Vande Voorde,* 139 Neb. 827, 299 N. W. 175, 137 A. L. R. 554; *Harrison v. Miller,* 21 S. E. (2d) (W. Va.) 674; L. R. A. 1918B, 7; 4 Pomeroy's Equity Jurisprudence (5th ed. 1941) 116, § 1052.

▆ Though the property in the present case was surrendered or abandoned by the administrator to a third party who had an interest in the property and who in turn sold it to respondent Washington Fruit & Produce Company, the attendant circumstances present a close analogy to the type of sales declared void or voidable by courts of equity. Some time prior to the surrender of the property to the Guaranty Trust Company, an agreement had been reached between that company and the respondents with respect to the ultimate disposition of the property. The surrender was in effect a surrender to the respondent Washington Fruit & Produce Company, which likewise, in effect, was the assignee of the claims formerly held by the Guaranty Trust Company, the third-party creditor.

▆ It matters not that the surrender was forced by a third party holding claims against the estate. The type of situation where a third party compels disposal of estate property is discussed at some length in 3 Bogert, Trusts and Trustees, 1525, § 486. We quote a portion thereof:

"Frequently the property held by the fiduciary for the benefit of others is subject to a lien or incumbrance in favor of a third person, this lien is enforced, the property sold under court proceedings, and the question arises whether the fiduciary is qualified to purchase in his own interest or may be made a constructive trustee for his beneficiaries if he does buy with his own money for his private benefit.

"The fundamental rule of equity that the trustee must be wholly loyal to his cestui, and must exclude all personal interest in respect to the trust property, would seem to apply here and to justify fastening a constructive trust upon the purchasing trustee.

"A majority of the decisions which have considered the problem do hold that it is a violation of his fiduciary duty for a trustee, or other person in like position, to purchase on such a forced sale. They make no difference between the purchase by the trustee on his own sale and a purchase on a sale produced entirely by the efforts of a third person, so long as the trust res is the subject of both sales."

See, also, *Eagle v. Terrell*, 95 Ark. 434, 130 S. W. 550; *Landis v. First Nat. Bank of Lamanda Park*, 20 Cal. App. (2d) 198, 66 P. (2d) 730; *Skrine v. Simmons*, 11 Ga. 401; *McCreedy v. Mier*, 64 Ill. 495. See, further, on the general subject, an annotation in 77 A. L. R. 1513.

 The fact that the property was actually transferred to the Washington Fruit & Produce Company, rather than to Plath himself, does not vitiate the establishment of a constructive trust. Plath, the former administrator, was at all times the president and general manager of the corporation and held a majority of its capital stock. It is the general rule that the sale of trust property by the trustee, executor, administrator, or guardian to a corporation of which he is an officer or stockholder is voidable. *In re Schuster's Estate*, 35 Ariz. 457, 281 Pac. 38; *Crawford County Bank v. Bolton*, 87 Ark. 142, 112 S. W. 398; *Otier v. Neiman*, 96 Misc. 481, 160 N. Y. Supp. 610; *Macfadden v. Jenkins*, 40 N. D. 422, 169 N. W. 151. See, also, annotation

in 105 A. L. R. 449, and 3 Pomeroy's Equity Jurisprudence (5th ed. 1941) 810, § 958a.

In any event, the respondent corporation could not, in this instance, claim to be a *bona fide* purchaser of the property, for all of its officers and stockholders were fully conversant with the facts and circumstances which led to the purchase by the corporation, and therefore it must be held to have had knowledge of the breach of trust and have adopted the means by which the property was procured. *Saar v. Weeks,* 105 Wash. 628, 178 Pac. 819.

That the appellant failed to tender to the respondents the amount of the purchase price of the property is not a bar to the present action, inasmuch as the respondent Washington Fruit & Produce Company at all times denied the existence of a constructive trust, and claimed its right to reimbursement for items which could not be determined until an accounting was had. Tender of the purchase price, under such circumstances, would have been a useless thing.

The statute of limitations did not operate to bar the action because, according to the evidence, appellant did not discover the facts with reference to the negotiations resulting in the purchase of the property by the Washington Fruit & Produce Company until sometime in 1940, one year prior to the commencement of this action.

Furthermore, the deed to that company did not constitute constructive notice to appellant, since she was not a subsequent purchaser or encumbrancer. The recording of an instrument pursuant to a recording statute such as Rem. Rev. Stat., § 10596-2 [P. C. § 1914-2], is constructive notice to those persons only who acquire interests subsequent to the execution of the instrument or who, in dealing with property, are compelled to search the public records in order to protect their own interests; it does not affect the rights of prior parties. *Ackerson v. Elliott,* 97 Wash. 31, 41, 165

Pac. 899, 903; 45 Am. Jur. 470, Records and Recording Laws, § 89.

Appellant next presents an assignment of error based upon the refusal of the trial court to permit the introduction of evidence of the rental value of the real and personal property withheld from her by the respondents. The original theory of the case as presented to the trial court was that of a constructive trust and a required accounting by the respondents. The prayer of appellant's complaint reads:

" . . . prays the Court that said defendants [respondents] be required to account for all of the property and assets of said estate which came into their hands together with all income, increase, accruals, profits, commissions and every other thing of value in money or property received by said defendants or either of them in the manipulation of said property; that said defendants be required to deliver, pay over and account to the plaintiff [appellant] and the unpaid creditors of said Delbert J. Foster, deceased, all thereof; [then follows the usual provision for general relief]."

When it became apparent to the appellant that the trial court was allowing respondents certain disputed charges against the property, thus seriously affecting the amount of her expected recovery, she sought to introduce evidence of the reasonable rental value of the property during the period of respondents' possession. Objection to the introduction of such evidence was sustained on the ground that appellant had elected the remedy of accounting, and therefore could not show, as a measure of her damages, the reasonable rental value of the property. Appellant now contends that no question of election of remedies was involved, but simply a question of the measure of recovery.

A constructive trust is imposed in order to prevent unjust enrichment, where it is against equity that one who holds certain property should retain it. *In re Parkes' Estate,* 101 Wash. 659, 172 Pac. 908, judg-

ment modified on rehearing in *In re Parkes' Estate,* 105 Wash. 586, 178 Pac. 830; *Nicolai v. Desilets,* 185 Wash. 435, 55 P. (2d) 604; *In re Peterson's Estate,* 12 Wn. (2d) 686, 123 P. (2d) 733; 4 Pomeroy's Equity Jurisprudence (5th ed.) 95, § 1044; 3 Scott on Trusts 2317, § 462.2.

 On the theory of unjust enrichment, therefore, the constructive trustee may be compelled to convey or assign the corpus of the trust property, and to account for and pay over the rents, profits, issues, and income which the constructive trustee has actually received, or, in general, which he might by the exercise of reasonable care and diligence have received. 4 Pomeroy, *op. cit. supra,* 143, § 1058. See annotation in 36 A. L. R. 1331, on the question of the liability of a constructive trustee for rent or rental value of property.

In appellant's prayer for relief, *supra,* only one ground of relief asked for was set out with any degree of particularity, namely, an accounting by the constructive trustee of its profits. The case proceeded to trial upon this theory and a full accounting was ordered by the court. Not until the accounting had been rendered and testimony taken thereon did appellant give any clear indication that she was seeking to obtain relief, in the alternative, by way of the rental value of the property during the period of the constructive trust.

Having failed to allege any lack of reasonable care and diligence in the management of the property by the constructive trustee after it had received the deed to the property, and having failed to plead or prove any facts tending to show any such lack of reasonable care and diligence, appellant was remitted to the rents, profits, issues, and income which the constructive trustee had actually received. The objection to the introduction of testimony upon the question of rental value was properly sustained.

We will now consider appellant's assignments of error directed to certain charges appearing in the account and allowed by the trial court.

During the period of administration, roughly from April, 1931, to December, 1936, the estate suffered a deficit of $3,594.84, as shown above in this opinion. This deficit was incurred in the operation of the orchard property, and the moneys making up the amount thereof were advanced by the respondent Washington Fruit & Produce Company. The trial court allowed the charge, and appellant now contends that the ruling was error.

It is to be noted that this amount was advanced by the corporation *prior* to the time when it became a constructive trustee of the property. It is also clear from the record that the advances were made in good faith and were used to defray actual and necessary expenses in operating the property of the estate. The advances so made therefore constituted a legitimate indebtedness owing to the corporation, and had there been sufficient funds in the estate at the time it was closed, the corporation would have been entitled to be reimbursed. Since that indebtedness has never been repaid, we see no reason why the corporation should not be allowed an equivalent credit in an accounting of what it owes to the estate or the beneficiaries thereof.

In one of appellant's assignments of error she asserts and complains that the trial court refused to require respondents to account for the apples in storage at the time of Delbert J. Foster's death in 1931. This is the item of 3,882 boxes of Winesap apples, valued at $4,351.80, referred to in the early part of this opinion. This matter relates to Plath's administration of the estate culminating in his final report, and, for the reasons already given above, appellant is now foreclosed from raising any question on that score. However, as also previously stated, while that item, or amount,

does not appear as a distinct and separate item in any of the administrator's reports, it appears actually to have been included in the report made by the administrator on October 6, 1933, with reference to the returns from any and all fruit belonging to the estate on that date. We are convinced from the record that such is the fact.

Under another assignment of error appellant complains and contends that the trial court refused to require respondents to account for the fruit harvested in 1936 and the profits which respondents realized from the handling of that fruit. The record shows that a full accounting for the operations during the period from July 1, 1936, to June 30, 1937, was made, showing a profit on the sales of fruit amounting to $3,098.91, and that appellant was given credit for that amount.

In this connection, appellant's further and principal contention seems to be that the trial court should also have disallowed any item of profit to the respondents found in their charges for handling the fruit after it reached the produce company's storage plant. For these services the produce company made the same charges to the estate as it did for similar services rendered to other fruit growers. Suspecting that these charges contained some percentage of profit to the produce company, appellant sought to require the company to break down its service charges into their constituent elements so as to show what percentage of profit it had gained from each. The trial court refused to permit this to be done. It is not contended, nor does any evidence tend to prove, that these charges were unreasonable, or greater than Delbert J. Foster himself had customarily paid the company for such services, or greater than the estate would otherwise have had to pay if the fruit had been handled through some other packer.

It frequently has been held that a construc-

tive trustee is entitled to his reasonable expenses and charges in caring for the property. *Fisher v. Grady,* 131 Fla. 1, 178 So. 852; *Olson v. Lamb,* 56 Neb. 104, 76 N.W. 433, 71 Am. St. 670; *Marlatt v. Warwick & Smith,* 18 N. J. Eq. 108, affirmed in 19 N. J. Eq. 439; *Cowing v. Howard,* 46 Barb. (N. Y.) 579; *Butman v. Whipple,* 25 R. I. 578, 57 Atl. 379; *Ludington v. Patton,* 111 Wis. 208, 86 N. W. 571. Upon the facts and circumstances involved in this case, we find no error in the ruling of the court in this respect.

Appellant next assigns error of the trial court in allowing to respondents interest on the purchase price of the property; in charging appellant with the cost of machinery, equipment, and improvements furnished by the respondents; and in not deducting for the depreciation of such machinery, equipment, and improvements. On the other hand, respondents assign error upon the refusal by the trial court to allow interest on all advances and improvements, and in not allowing recovery for certain improvements which the court decreed were to go with the land.

The rights of the respective parties in case of a constructive trust are matters of equitable cognizance and are to be determined in the light of the familiar maxim that he who seeks equity must do equity. In a suit relating to the establishment and enforcement of a constructive trust the relief to be granted depends largely upon the equities and circumstances of the particular case and, as a general rule, the court will adjust the relief in such a manner as will best afford protection to the rights of all parties concerned. 65 C. J. 1067, Trusts, § 996.

It is generally held that a constructive trustee is entitled to be reimbursed for the price paid by him for the property before he can be compelled to reconvey the property to the true beneficiary. *Soderberg v. McRae,* 70 Wash. 235, 126 Pac. 538; *Gunn v. Brantley,* 21 Ala. 633; *Assunto v. Coleman,* 158 La. 537,

104 So. 318; *Cann v. Barry*, 293 Mass. 313, 199 N. E. 905, (later appeal) 298 Mass. 186, 10 N. E. (2d) 88; *Lass v. Sternberg*, 50 Mo. 124; *Hoover v. Strohm*, 44 Pa. Super. Ct. 177; *Home Inv. Co. v. Strange*, 109 Tex. 342, 195 S. W. 849, reformed and affirmed in 109 Tex. 350, 204 S. W. 314, and again in 109 Tex. 351, 207 S. W. 307; *Harrison v. Manson*, 95 Va. 593, 29 S. E. 420; 65 C. J. 1072, Trusts, § 1000.

Usually, also, the constructive trustee is allowed interest on such purchase money. *Holloway v. Eagle*, 135 Ark. 206, 205 S. W. 113; *Oviatt v. Smith*, 226 Mich. 253, 197 N. W. 535; *Marr v. Marr*, 73 N. J. Eq. 643, 70 Atl. 375, 133 Am. St. 742; *Hoover v. Strohm, supra*; *Harrison v. Manson, supra*.

Likewise, the constructive trustee is usually allowed credit on his accounting for improvements made by him on the property, particularly where they have been made in good faith. *Browning v. Kelly*, 124 Ala. 645, 27 So. 391; *Holloway v. Eagle, supra*; *Pharr v. Fink*, 151 Ark. 305, 237 S. W. 728; *Fisher v. Grady, supra*; *Sunter v. Sunter*, 190 Mass. 449, 77 N. E. 497; *Peoples v. Aubrey*, 177 Minn. 252, 225 N. W. 14; *Lawley v. Hickenlooper*, 64 Utah 543, 231 Pac. 821, 36 A. L. R. 1327. In the latter instance, however, interest does not seem to be allowed as readily as in the case of reimbursement for the purchase price of the property.

With reference to appellant's claim for depreciation, the record discloses that the machinery, equipment, and improvements here involved were all necessarily devoted to, and used upon, the farm and are now considered as integral parts thereof. If the appellant takes over the property, she will realize the benefit of their former addition and use, and the respondents in turn will sustain a corresponding loss.

As stated before, allowance or disallowance of claims is a matter dependent upon the particular facts and circumstances of the case, and therefore rests

largely in the good judgment and discretion of the chancellor. Measured by these principles, the rulings of the trial court upon the assignments here under consideration afforded fair protection to all the parties and accomplished a just result.

Upon her last assignment of error, appellant contends most strenuously that the trial court erred in requiring her to pay into the registry of the court the sum of $21,635.80, with interest, as a condition precedent to a further accounting by the respondents of the returns upon the 1942 crop, and in refusing a continuance of the trial until the harvest of that crop.

■ This action was begun in March, 1941. The trial commenced June 8, 1942, and as to the basic issues involved was concluded on June 12th, at which time the court directed the respondents to render an accounting of their operation of the property since December 28, 1936. The accounting was rendered in written form and the hearing thereon was begun on August 20, 1942. Appellant's counsel at that time requested that the matter be continued until after the 1942 crop had been harvested. With the view of enabling counsel to study the account and to agree among themselves as far as possible upon the items and amounts set forth therein, reserving the disputed items for further consideration, the court postponed the hearing to September 17, 1942. Thereafter on September 21st, at the conclusion of the hearing on the account, lasting five days, appellant's counsel moved for a further continuance until the 1942 crop had been harvested. The motion was denied, and the court thereupon proceeded to make its rulings upon the account.

It will be noted that the trial court did require a full accounting up to the time of the trial on the main issues and that such accounting was in fact rendered. Although there was a growing crop of fruit upon the land at the time of the rendition of the account, it was

not yet ready for harvest and therefore could not be included in the account rendered. Some time had to be fixed, more or less arbitrarily, for the limits of the account, and we believe that the court acted properly in delaying an accounting for the 1942 crop until it could be more accurately determined. There is no contention in this case that respondents are insolvent or will be unable to respond financially for any amount that may be found to be due to appellant from the 1942 operations. Parenthetically, we point out the fact that since the entry of the decree the matter of the *1943* crop has become as much a question of settlement as the 1942 crop was at that time. This merely serves to emphasize the propriety of the trial court's ruling.

We are also of the belief that the court acted properly in requiring the appellant to deposit in the registry of the court the amount found to be owing to the respondents, as a condition precedent to being let into possession of the property and having a further accounting for the 1942 crop. The rights of the parties were fixed by the decree. Appellant was thereby adjudged to have the right of possession upon payment of the amount owing by her. She had demanded an accounting and had received it. Certainly she could not claim possession and use of the property until she had reimbursed respondents for what was owing to them. Nor would it be just or equitable to permit her to put respondents to the trouble and expense of a further accounting, or a series of accountings, unless there was some assurance that in the end she intended and was able to pay whatever was due from her on taking possession of the property. Otherwise, respondents would be put to the hazard of continuing to operate the farm indefinitely, account to appellant for any profits that might be made from year to year, and stand any losses that might similarly result. The only assurance that respondents would have under that condition would be that if the operations

were profitable, appellant would exercise her right to retrieve possession of the farm, but if there was a loss, appellant would in all likelihood abandon her right of possession. To allow appellant that freedom of choice would, in our opinion, be wholly inequitable and unjust.

In one respect, however, we think the condition imposed upon appellant was erroneous. In fixing the amount to be paid into court at $21,635.80, the court included the sum of $4,765.17 for production costs with reference to the 1942 crop, although, as stated before, that crop had not yet been harvested and necessarily no returns therefrom had yet been received. The effect of including the production cost of the 1942 crop was to compel appellant to pay that amount into court before any accounting for that year had been made. Since the court deferred accounting by the respondents as to the 1942 crop to a time subsequent to the completion of the harvest, we believe that the cost of production for that year should likewise have remained in suspense until a full accounting for that year became necessary. The amount to be paid by appellant into the registry of the court should therefore be decreased by $4,765.17.

Respondents assign as error the refusal by the trial court to allow them a credit of $7,256.20 for net loss of operations during the period covered by the accounting. It is a generally accepted principle that a constructive trustee is not entitled to recover losses resulting from the operation of property belonging to another. Restatement, Restitution (1937), 604, § 151f; p. 630, § 158, Comment (a). The court did not err in refusing to allow respondents credit for this amount.

Respondents further assign error upon the refusal by the court to allow them the sum of $273.95 for a pump which respondents had installed upon the property. The pump was necessary to the operation of the

farm and is still upon the premises. We think the above amount should have been allowed as a credit to respondents.

█ Respondents finally assign error upon the allowance to appellant of certain witness fees. These witnesses were called by appellant and were competent and qualified to testify. Respondents' objection to their testimony, however, was sustained. Although the court held that the subject upon which these witnesses were called to testify was not a material issue, that subject was a debatable question down to the time of the ruling thereon by the court. The witnesses were called in good faith on a matter which appellant believed, with some show of reason, to be relevant and important, and it cannot be said that the calling of these witnesses was useless or frivolous. The costs were properly allowed.

Having disposed of the various assignments of error, we come to the point of the proper disposition of the case. The decree adjudged (1) that the appellant is entitled to the right of possession of the real property herein involved together with certain specific personal property on hand at the time of the closing of the Delbert J. Foster estate, on condition, however, that appellant pay into the registry of the court on or before ninety days from the 22nd day of September, 1942, the sum of $21,635.80 with interest thereon at the rate of six per cent per annum from July 1, 1942; (2) that, when that amount is paid into the registry of the court, it shall remain there until a final accounting has been made as to the 1942 crop and production thereof, and when such final accounting is made appellant shall be given title to the real and personal property and crops therefrom, the court retaining jurisdiction until final accounting and determination has been made; (3) that in the event that appellant does not deposit the amount as required, then this action shall be dismissed, and title to the property

shall be and remain in the Washington Fruit & Produce Company; and (4) that in the event respondents, upon performance of the decree by appellant, fail to execute and deliver to appellant a proper conveyance of the property, the clerk of the court was appointed and empowered to execute and deliver such convey-. ance.

In view of our rulings, as heretofore expressed, the decree will be modified in the following particulars: (1) To the sum of $21,635.80, therein fixed, will be added the sum of $273.79; (2) from the total amount of those two sums will be deducted the sum of $4,765.17; (3) the appellant will be allowed a period of thirty days from the date of filing this opinion to deposit into the registry of the court the corrected amount of $17,144.42. In all other respects the decree will stand affirmed. None of the parties will recover costs upon the appeal or upon the cross-appeal.

SIMPSON, C. J., MILLARD, JEFFERS, and MALLERY, JJ., concur.