[No. 41930.    Department Two.    October 14, 1971.]

RAY L. JOHNSON et al., *Respondents*, v. HARRIGAN-PEACH LAND DEVELOPMENT COMPANY, INC., et al., *Appellants.*

746

*Welling, Post & Coble* and *Kenneth O. Welling,* for appellants.

*James R. Reynolds* and *Johnson, Inslee, Best & Chapin,* for respondents.

HALE, J.—Who would doubt that life could be beautiful in a mobile home on a freshwater canal at Golden Sands hard by the Strait of Juan de Fuca? There it was at Dungeness, north of Sequim, a flat, grassy meadow running down to the beach along the strait. Each mobile home would front on a continuously flowing freshwater canal, navigable for small boats; and there would be locks to let residents maneuver their small craft from fresh water out into Dungeness Bay and then return to the Golden Sands Yacht and Beach Club to which all who dwelt there could belong. There would be a swimming pool, too, and a strip of ocean beach set apart for everyone in Golden Sands to enjoy.

Mr. Ted G. Peach, a real-estate broker and former owner of Peach's Used Cars at Sixth and Blanchard in Seattle, was mindful of these natural endowments when he helped Mr. Wayne C. Harrigan organize the Harrigan-Peach Land Development Company. Mr. Peach had been in the automobile business for about 25 years, he said, but left it to go into real estate in 1962 or 1963, obtaining his broker's license in 1964. He had organized, he said, the Holmes Harbor Yacht and Golf Club, and served as a real-estate salesman at Sun Land in Sequim for about 6 months.

In March of 1966, he and defendant Wayne C. Harrigan, incorporated the Harrigan-Peach Land Development Company with defendant Harrigan receiving 24½ shares, Mr. Peach 49 shares, and a Mr. Williams 24½ shares with one share going to another individual. Mr. Peach agreed to pay

for his stock in services to the corporation instead of money.

Defendants distributed sales material printed in color which said:

Fish from your own lot in a beautiful waterway stocked with Rainbow and Eastern Brook Trout. Dig clams or trap the famous Dungeness crab. Nearby, rivers offer the best steelhead fishing in the Northwest, salmon fishing supreme is at your doorstep. Near Golden Sands the hunter will find elk, deer, bear, cougar, and an abundance of pheasants, ducks, geese and brant. Without a doubt, this is the most unique, cleverly planned land development for mobile homes anywhere. It is so fantastic, words cannot justify its beauty. The clean clear fresh waterways, leisurely flowing into the straits of Juan de Fuca, are surrounded by the beautiful Olympic Mountains. Directly to the north you see Mt. Baker and the San Juan Islands, ocean liners are most always in view, cruising up and down the straits.

The brochures, distributed to prospective lot purchasers, promised—and included an application form for—a free introductory membership in the Golden Sands Yacht and Beach Club. On the membership application form were such caveats as "After 8:00 p.m. gentlemen will wear jackets in the dining room and cocktail lounge," and a warning that, during the day, dry bathing suits could be worn but wet bathing suits would be prohibited in the clubhouse at all times—presumably to protect the furniture. The printed sales materials identified Ted G. Peach Associates as exclusive sales agents and bore the printed signature in script and print of Ted Peach as Golden Sands Manager.

Plaintiffs purchased lots in Golden Sands from defendant Harrigan-Peach Land Development Company. The court found that, aside from the more lyrical commentary concerning the beauties of nature, climate and scene, the buyers relied upon what the court described as personal warranties, representations and inducements made either by the corporation's officers, directors, incorporators or promoters, or with their knowledge and consent, or under such circumstances that the individual parties defendant knew

or were charged with knowing of and would benefit from sales induced by such warranties, representations and inducements. These warranties, representations and inducements, as the court described them, and upon which plaintiffs relied in buying the lots, included the following:

1. All underground power and water lines had been installed and were usable by each owner solely on payment of a hook-up charge;

2. A sanitary sewer treatment plant would be installed by December 31, 1966, with stubs for each lot at no expense to the lot purchasers except for a hook-up charge estimated at $250;

3. Each lot would be raised and graded to provide drainage and planted with grass by December 31, 1966;

4. A waterway would be constructed, flowing among the lots as shown on a map outlining Golden Sands Division No. 1, and supplied with fresh water from wells, and would be navigable by small vessels. It would have a continuous supply of moving fresh water so as not to become "stagnant and/or a mosquito swamp," all to be maintained in first-class condition for 2 years or until the Golden Sands Yacht Club had 100 members, and ultimately would be deeded over for the benefit of the lot owners;

5. Each lot owner would have access to the ocean beach and owners of small boats would have access from the channels or canals to the ocean;

6. Roads, described as Golden Sands Boulevard, Sealane Drive, Sands Place, and others shown on the map of division 1 as being acceptable to Clallam County, would be in and open by December 31, 1967; and

7. All work and development with respect to the "channels, water ways, boat accesses, road accesses . . . would be done promptly in a first-class work-man like manner."

Each of the plaintiffs purchased lots from defendant Harrigan-Peach Land Development Company, relying in part on these representations and inducements.

These representations, warranties and inducements the

court found to be false and fraudulent—a finding we think based on substantial evidence. The court made specific findings that the defendants had failed and refused to install the promised underground power and water lines; defendants failed to raise the level of and plant grass on the lots, leaving them swampy; the waterways were only partially constructed, and there was no continuous flow of fresh water as promised; no pumping or other facility had been installed to provide a continuous flow of fresh water; no attempt had been made by defendants to install sanitary sewer service or a sanitary sewer treatment plant, and no provision had been made for building a sewage plant or sewage collection lines; defendants had not provided beach access for each property owner, nor means of navigating their small boats from the promised canals or channels to the ocean; and that defendants had not, as they had promised, oiled or blacktopped the roads within the division, and the same had not been accepted and would not be maintained by Clallam County.

Had this been simply a suit brought upon an asserted breach of contract for rescission and refund of moneys paid, there would probably have been no appealable issue —so clear-cut and well supported in proof were the findings of fact. *In re Estate of Reilly,* 78 Wn.2d 623, 479 P.2d 1 (1970); *Noah v. Montford,* 77 Wn.2d 459, 463 P.2d 129 (1969); *Coy v. Raabe,* 77 Wn.2d 322, 462 P.2d 214 (1969); *Lindbrook Constr., Inc. v. Mukilteo School Dist. 6,* 76 Wn.2d 539, 458 P.2d 1 (1969); *John R. Hansen, Inc. v. Pacific Int'l Corp.,* 76 Wn.2d 220, 455 P.2d 946 (1969); *Wells v. Scott,* 75 Wn.2d 922, 454 P.2d 378 (1969); *Black v. Evergreen Land Developers, Inc.,* 75 Wn.2d 241, 450 P.2d 470 (1969); and *Watson v. Yasunaga,* 73 Wn.2d 325, 438 P.2d 607 (1968). This is not a suit for rescission, however, but rather a suit maintained, as plaintiffs put it, to preserve the benefit of their bargain and to enforce a conveyance, and to recover thereby the difference between the actual value of the property as sold to them and its value as promised, with all of the improvements, changes and devel-

opments. They seek their remedy not only from the corporation, Harrigan-Peach Land Development Company, but individually from Ted Peach and Wayne Harrigan and their respective marital communities.

Applying plaintiffs' theory of damages, the court allowed them recovery for the proved difference in value and, upon payment of actual value, a conveyance of the lots they had purchased. For example, plaintiff Ray L. Johnson paid $3,300 for lot 17, Golden Sands Division 1, which the court found to be the fair market value had defendants' representations and warranties been true. It found, however, that the actual value was not over $100 and allowed plaintiff Johnson damages of $3,200. Another example, plaintiffs Edward and Kathryn Nelson bought lot 8 under real-estate contract at a price of $3,040, paid $1,614 on the contract, but the court found that the lot had an actual value of only $100, representing a loss of $2,940 to the Nelsons. At the time they ceased paying on the contract, there was a balance due of $1,426.25 which the court regarded as a setoff and accordingly awarded plaintiffs judgment of $1,514. Plaintiff Donald Dean paid cash of $3,060 for lot 26 which the court found to be worth only $100, entitling plaintiff to judgment of $2,960; plaintiff Muriel Meyer agreed to pay $3,600 for lot 20, paid $535 on principal and $221.35 interest, leaving her balance at $3,065 on the property which had an actual value of only $100. The trial court ruled that, subject to offsetting the $3,065 owed by her, she should recover $3,500 in damages.

In each recovery, including those granted other plaintiffs but not discussed here, the defendant Harrigan-Peach Land Development Company was ordered to deliver to each plaintiff a warranty deed to the lot he had purchased; and the court appointed a receiver and commissioner to execute the deeds on behalf of the insolvent corporate defendant. The court also granted money judgment against the defendants Ted Peach and his wife and Wayne Harrigan and wife individually and as respective communities and against the corporation.

Defendant Wayne Harrigan as his main point on appeal contends that, even though the corporation might be liable and his codefendant, Ted Peach, liable personally, there was no evidence to connect Harrigan with any false representation, promise or unfulfilled warranty and that, therefore, he could not be held responsible under any tenable legal theory for the statements, misrepresentations and breaches of warranties of others. The court, however, was warranted from the proof in rejecting his defense. There was evidence that defendant Harrigan had specifically assumed responsibility for managing the initial stages of a sewer survey and construction and had instructed his sales manager that the sewer system as represented in the sales brochures and promised in sales talks would be built and put in operation; and that, although he was president and a director of the company, Harrigan took no steps to provide the money for the sewer system, nor did he repudiate the promise of its construction when he knew that it could not and would not be built by the corporation or by anyone else.

There was evidence from which the court could find that both Harrigan and Peach actively participated in setting up the sales program by which the company's agents would sell the lots and that they knew of and approved the representations that would be made by the sales representatives and instructed the company's sales agents as to what promises should be made in inducing the purchasers to buy the lots.

Both Harrigan and Peach informed the company's sales agents that a sewer system would be installed, freshwater canals built and moving fresh water kept running into them, and that there would be a clubhouse, yacht club, tennis courts, roads, beach rights and navigability between the canals and the ocean for small craft. They authorized representations to that effect to be made in the sales literature and talks, and at no time did Harrigan disavow or repudiate these representations. Thus, their actions in law

amounted to a legal adoption of these promises, representations and inducements.

The law does not require that to be rendered individually liable an officer or trustee must personally make false statements to the party who has been induced thereby to act upon them; it is sufficient if he sanctions or approves of the false statements. *Crescent Mfg. Co. v. Hansen*, 174 Wash. 193, 24 P.2d 604 (1933). The link to Wayne Harrigan and Theodore Peach holding them liable along with the corporation for plaintiffs' damages is, as the court's finding described it, that "representations, warranties and inducements" oral and written were made to the plaintiffs with knowledge they were false and with knowledge that plaintiff purchasers would and did rely on them, and additionally that these false representations were, as the findings state, "recklessly made with the reckless disregard for the truth" personally by the defendants and by their agents and employees, with the individual defendant's knowledge, consent and permission. Liability here, therefore, arises from tortious misrepresentation and fraud, practiced by the defendants individually, corporately and through agents for the benefit of the tort-feasors inducing others to act to their detriment and damage.

Incorporation does not in law shield the actor from the legal consequences of his own tort. Where individuals carry on a business or enterprise by means of a corporate structure but in such relationship to the corporation that it can be said as a matter of fact that the acts of the corporation are the acts of the individuals and vice versa, then the same conclusion should be reached as a matter of law, *i.e.*, that the acts of the corporation are in law as well as fact the acts of the individuals and vice versa. *See*, Annot., 152 A.L.R. 696 (1944). This court has adopted that principle in other contexts but nevertheless so as to make it the law of this jurisdiction.

Thus, in *Dodson v. Economy Equip. Co.*, 188 Wash. 340, 343, 62 P.2d 708 (1936), we said:

The liability of an officer of a corporation for his own

tort committed within the scope of his official duties is the same as the liability for tort of any other agent or servant. . . .

. . .

Where the officer performs an act or a series of acts which would amount to conversion if he acted for himself alone, he is personally liable, even though the acts were performed for the benefit of his principal and without profit to himself personally.

An officer of a corporation, consequently, is liable for a tort committed in the course and within the scope of his official duties to the corporation the same as any other agent or servant is liable for his torts (*Dodson v. Economy Equip. Co., supra; Messenger v. Frye*, 176 Wash. 291, 28 P.2d 1023 (1934)), for an agent is not exonerated from the consequences of his torts by the fact that, in committing them, he acted for his principal. Annot., 152 A.L.R. 696 (1944).

It is true, as pointed out in *Messenger v. Frye, supra,* at 295, that an officer of a corporation who takes no part whatever in a tort committed by the corporation is not personally liable to third persons for such tort but, as the court with equal clarity says in that case, this immunity vanishes if such corporate officer knowingly participated in, cooperated in the doing of, or directed that the acts be done.

The record enabled the court to find that both Harrigan and Peach participated in and directed the doing of the acts which the court held to be fraudulent and deceitful. There was evidence, too, tending to prove their direct participation in and subsequent adoption of the misrepresentations and false statements. And, as earlier noted, even without proof of direct participation, there was evidence that they occupied positions of such close control, management and direction over the Harrigan-Peach Land Development Company and the sales program and campaign to sell the lots in controversy, that the law charges them with knowledge of such fraud and misrepresentation, and thus renders them liable for the false statements of the corporation's

agents made to prospective purchasers in carrying out the corporation's sales campaign program. *Crescent Mfg. Co. v. Hansen, supra.*

Corporate officers are not personally and civilly immune from the fraud of the corporation even though not personally participating in or making the statements or misrepresentations upon which the claim of fraud is based if they sanction or approve or adopt the false statements or misrepresentations; or, as officers, if they know that false and fraudulent misrepresentations were being made for and on behalf of the corporation; or if they exercise such close control, direction and management of the corporation that the law as a matter of elemental justice ought to charge them with knowledge of such fraud.

Appellants' other assignments of error are directed to findings of fact, either that there was insufficient evidence to support the findings, or that they do not support the court's conclusions of law. In both respects we find from our review of the record that there was sufficient evidence to support each finding (*In re Estate of Reilly, supra; Noah v. Montford, supra; Coy v. Raabe, supra; Lindbrook Constr., Inc. v. Mukilteo School Dist. 6, supra; Hansen, Inc. v. Pacific Int'l Corp., supra; Wells v. Scott, supra; Black v. Evergreen Land Developers, Inc., supra;* and *Watson v. Yasunaga, supra*) and that they are thus the facts in the case, and we agree that the court's conclusions of law were correctly drawn from them and support the judgment.

Affirmed.

HAMILTON, C.J., ROSELLINI, SHARP, and WRIGHT, JJ., concur.