[Nos. 43644, 43745. En Banc. July 22, 1976.]

THE STATE OF WASHINGTON, *Respondent*, v. RALPH
WILLIAMS' NORTH WEST CHRYSLER PLYMOUTH, INC.,
ET AL, *Appellants*.

*James C. Young, Ronald L. Hartman,* and *Caidin, Kalman, Hartman & Sampson,* for appellants.

*Slade Gorton, Attorney General,* and *Barbara Rothstein, Thomas L. Boeder,* and *John R. Ellis, Assistants,* for respondent.

HAMILTON, J.—Appellants are Ralph Williams' North West Chrysler Plymouth, Inc. (North West), a Washington corporation, Ralph Williams, Inc. (RWI), a California corporation, and Ralph Williams, individually and as corporate president of North West and RWI. They appeal from an order imposing terms upon the granting of a continuance and from a judgment assessing civil penalties for unfair and deceptive practices in the operation of an automobile business. The appeals from the respective orders were consolidated and will be considered seriatim. We affirm both the order and the judgment.

In May of 1968, North West opened its automobile dealership in North Seattle. In October 1970, respondent, the State of Washington, brought an action against appellants claiming violations of the Consumer Protection Act (RCW 19.86), the retail sales installment act (RCW 63.14), and the unfair motor vehicles practices act (RCW 46.70). Respondent also sought civil penalties, restitution of consumers' property in appellants' possession, and an order permanently enjoining appellants from engaging in any future deceptive acts and practices. The dealership continued to operate until December 1970. The State Department of Revenue closed North West because it failed to pay certain excise taxes which it had collected from its customers.

Initially, the trial court concluded there was no possibility North West would conduct future business in Washington State. The court declared the entire case moot and granted appellants' motion to dismiss. In *State v. Ralph Williams' North West Chrysler Plymouth, Inc.,* 82 Wn.2d 265, 268, 510 P.2d 233, 59 A.L.R.3d 1209 (1973), we reversed the trial court's judgment on all grounds and remanded the case for a trial on the merits.

In November 1973, the trial judge set trial for March 11, 1974. Three days before the scheduled trial date appellants'

then attorney filed a motion to withdraw. A continuance of the trial date was also requested. The withdrawing attorney initially represented appellants and Mr. Robert Friedman, the general manager of North West. In February 1974, Mr. Friedman dismissed the attorney as his counsel. Mr. Friedman and his new counsel commenced settlement negotiations with respondent. Respondent and Mr. Friedman negotiated a consent decree dismissing the amended complaint as it applied to Mr. Friedman. The decree also enjoined Mr. Friedman from engaging in future deceptive practices. Respondent then took another deposition from Mr. Friedman. His depositions supported respondent's position. Original counsel claimed he had an ethical duty to withdraw because of the conflict between appellants and his former client.[1] The trial court denied the motion to withdraw and granted a continuance, if appellants paid $10,000 to respondent for costs of delay and posted a $75,000 bond to protect respondent's potential judgment. The court also found that appellants and their attorney should have reasonably anticipated the ethical difficulties. Appellants appealed the trial court's order.

The Court of Appeals issued an amended order allowing the withdrawal of counsel and quashed the $10,000 terms deposit and the $75,000 bond. However, the court remanded the case to the trial court for a hearing to allow respondent

> an opportunity to make an adequate showing of the actual additional costs, fees and expenses to the State of Washington necessitated by reason of the continuance and following such a hearing the Superior Court may enter an order requiring the above-named petitioners to immediately pay an amount which would compensate the

[1](CPR) DR 4-101(B) states: "(B) Except when permitted under DR 4-101(C) and (D), a lawyer shall not knowingly during or after termination of the professional relationship to his client:

"(1) Reveal a confidence or secret of his client."

The attorney had an ethical duty not to reveal secrets of his former client. He also had a duty to represent appellants zealously within the bounds of the law. (CPR) Canon 6. He could not, however, adequately cross-examine Mr. Friedman without revealing the secrets of his former client.

State of Washington for any costs, fees and expenses the court finds reasonably and justly incurred by reason of the continuance; . . .

On April 12, 1974, the trial court conducted a hearing to decide the terms for a continuance. Respondent's attorneys and office personnel filed affidavits concerning the cost of the continuance. Appellants took the depositions of each person who filed an affidavit in support of the allowance of terms. Appellants were given access to relevant documents in respondent's possession. Each affiant also testified at the hearing. The affidavits, depositions, and testimony established the amount of time required to repeat the trial preparation. The court, however, rejected the hourly rates because they were not respondent's actual costs. Respondent based its costs on reasonable fees for similar services in the community. The court directed respondent to submit proof of the actual salaries of each person involved in the trial preparation. The court also requested respondent to offer proof of any overhead costs. Respondent submitted additional affidavits establishing the actual per-hour cost of the delay. Appellants were given an opportunity to refute the additional affidavits. The court entered an order awarding respondent $13,638.79 in terms. An appeal was taken from this judgment.

Appellants challenge the trial court's decision to award terms for the continuance. CR 40 (d) provides:

**(d) Trials.** When a cause is set and called for trial, it shall be tried or dismissed, unless good cause is shown for a continuance. The court may in a proper case, and *upon terms*, reset the same.

(Italics ours.) This rule vests the trial court with the power to impose terms as the condition for granting a continuance. The amended order of the Court of Appeals also recognized this power when it remanded the case to the trial court for a hearing to determine the actual costs of the continuance. The decision to impose terms is within the discretion of the trial court. We will overturn the court's decision only if there exists a manifest abuse of discretion.

*See Peterson v. David,* 69 Wn.2d 566, 569, 419 P.2d 138 (1966).

Appellants contend they did not cause a conflict of interest. Appellants claim the negotiated consent decree caused the conflict. We disagree. The Court of Appeals quoted with approval the original trial court order, which ruled that appellants and their attorney should have reasonably anticipated the ethical difficulty. On remand, the trial court did not reopen this issue. The record clearly supports the conclusion that appellants were responsible for the postponement. Mr. Friedman gave a number of depositions concerning his employment with North West. A simple examination of these depositions would have uncovered the future conflict of interest. Appellants waited until 3 days before the trial date to bring this matter to the trial court's attention. We therefore approve of the imposition of terms as a condition for granting appellants' motion for a continuance.

Appellants also challenge the procedure utilized by the trial court to resolve their continuance motion. CR 43(e)(1) states:

> (1) *Generally.* When a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or depositions.

Respondent's counsel and office personnel submitted affidavits of the actual cost of the delay. The cost included overhead, mailing charges, transportation costs, and lodging for witnesses. The affidavits also established the actual costs for attorneys, investigators, and an accountant. The affiants were the individuals who actually prepared the case for trial. Appellants took the depositions of these affiants and also examined the relevant documents. Further, the trial court conducted two hearings on the matter. Appellants examined each of the respondent's affiants at one of these hearings. Appellants were given every opportunity to refute the affidavits, depositions, and testimony. The procedure is consistent with the guidelines of CR 43(e). We

consider the amount of terms reasonable in light of the complexity of the case and the burdensome cost of duplicating the trial preparation. We therefore find no abuse of discretion by the trial court.[2]

The trial on the merits finally began on September 10, 1974. The trial court found numerous violations of RCW 19.86, RCW 63.14, and RCW 46.70. Following is a summary of these violations.

Appellants claimed they sold cars at prices lower than other area car dealers. Appellants also featured automobiles as specific illustrations of their low prices. Appellants' prices were, to the contrary, substantially higher than competitors' prices. In fact, the advertised illustrations were not even representative of their own prices. Appellants stated they could sell automobiles for lower prices, because they received volume discounts. An automobile industry witness testified each dealer pays the same invoice price for a car, and no dealer receives volume discounts.

Appellants represented in their advertisements that each purchaser received warranties on certain cars purchased from them. Many of appellants' automobiles came with a "12 by 12" warranty. This warranty provided a "12-month warranty at 10% over cost on all parts and labor or 12,000 miles, whichever occurs first." Appellants advertised they would perform any warranty repairs in their "huge factory-type reconditioning plant." The evidence revealed 12-by-12 warranty repairs were rarely available and when the warranty applied, the cost of the warranty repairs equaled or exceeded the repair costs at other reliable dealerships without any warranty whatsoever. Appellants did not possess a large reconditioning plant. Appellants' maintenance department was inadequate to service even a portion of the cars sold at North West. Appellants' sales personnel also made warranty statements concerning the condition of the

---

[2]Appellants' final contention concerns a failure of the trial court to enter findings of fact and conclusions of law. The trial court was not required to enter findings and conclusions. See CR 52(a)(5)(B).

cars and the applicability of the various North West warranties. These statements were false and deceptive.

Appellants' advertisements featured used car sales with easier credit terms than other dealerships. The advertisements misled consumers. The credit terms were substantially higher than advertised and more expensive than the terms offered by other dealers. The advertisements offered cars for sale for a minimal down payment and a single monthly payment—"$79 down, $79 per month." Contrary to the advertisements, North West demanded a substantial cash down payment. If the customer could not afford the down payment, North West required the person to finance it with a small loan institution.

Newspaper and television advertisements offered quality used cars for sale. Many of the cars possessed mechanical defects, body damage, and unusually high mileage. The advertisements concealed these defects. Also, the advertisements were not bona fide offers to sell the cars. They were designed to lure consumers into North West. After a customer arrived, sales personnel disparaged the advertised cars or told customers the cars had been sold.[3] Appellants then utilized a comprehensive sales system designed to confuse and deceive the customer. A North West salesperson switched the customer's attention to other cars at prices and terms more favorable to appellants. The staff member refused to give the prices of other cars or quoted prices lower than the actual sales prices. The salesperson also misrepresented the value that would be given on any trade-in models. If the customer expressed a desire to purchase the car, another North West staff member negotiated the contract. This person informed the customer of the increased price and monthly payments. The customer was

---

[3] One customer witness testified she saw appellants' late-night advertisement, which offered cars for sale at $60 down and $60 per month. The very next morning, the consumer drove to the dealership and asked to see these cars. The salesperson told the consumer the cars were "cheapies," and "[t]hey were all sold last weekend." The consumer left the dealership without purchasing an automobile. The consumer observed the same television advertisement the next weekend.

given little opportunity to even read the contract. A staff member read pertinent portions of the contract to the customer. The employee tape recorded a portion of the negotiations and told the customer North West utilized the recording to resolve future disputes. However, the employee only taped the self-serving portions of the transaction. This recording did not accurately represent the negotiations. Appellants used these recordings to discourage and intimidate future complainants.

As part of the normal sales procedure, appellants' sales personnel would obtain a customer's car for trade-in evaluation purposes. When a customer later objected to the increased price or merely declined to buy a car, the employee told the customer he could not return his automobile. This procedure was designed to exert pressure upon consumers to buy an automobile.

Appellants also informed customers that banks and other financial institutions required credit life and disability insurance. These institutions did not require such insurance. The sale of this insurance directly benefited appellants. RWI owned Banner Life Insurance Company, the agency which sold the insurance, and Williams owned the underwriter company.

Appellants also charged consumers $200 to $500 for dealer preparation on all of its cars. Appellants did not disclose this cost until after the consumer agreed to buy the car. Appellants performed minimal dealer preparation or did not prepare the cars at all.[4]

---

[4]The testimony of two witnesses illustrates appellants' sales operations. One witness saw appellants' television advertisement offering new cars for sale at low prices and for $54 down and $54 per month. The individual spoke broken English and possessed minimal reading skills. He went to the dealership to purchase the car. A staff member showed him a car, told him the car was new, and quoted a $2,600 purchase price. The consumer agreed to buy the car, and he presented a $50 cash down payment. Another salesperson informed the consumer of an additional $500 down payment. The consumer financed the down payment with a small loan company. Also, the consumer was told he had to purchase credit insurance. The salesperson sold both the consumer and his wife credit life and disability insurance. The total price

Seattle-First National Bank and Chrysler Credit Corpo-ration purchased the retail installment contracts from North West. These financial institutions repossessed many of the automobiles sold by North West, and they returned the automobiles to North West for resale. Appellants resold many of the cars for a price greater than the amount owed on the contract. Appellants did not return the profit of these sales to the initial purchasers as required by RCW 62A.9-504.[5]

---

of the car was $3,937.62, and this exceeded the retail sticker price. The terms of the sale required the consumer to pay $125 per month plus his monthly payment to the small loan company. The negotiations lasted 2 hours and involved four sales personnel. After signing the contract, the consumer discovered he had purchased a demonstrator and not a new car. Further, the car immediately developed mechanical problems. The consumer called the dealership and was told he had to wait 3 weeks for a service appointment. He eventually took the car to another automo-bile dealership.

Another witness testified he saw an advertisement offering a 9-pas-senger station wagon at a very attractive price. The consumer and his family, including his father and mother, drove to the dealership and asked a salesperson to show them the automobile. The car was in the back of the lot behind a fence. It was in poor condition and possessed unusually high mileage. The consumer informed the staff member he was not interested in the automobile. The salesperson switched the consumer's attention to a new 1970 station wagon for $4,700. The staff member also told the consumer he would pay a $130 monthly payment. The consumer agreed to purchase the car. However, during "closing" negotiations another staff member informed the consumer that the price of the automobile was $6,500. He also quoted a $250 monthly payment. The consumer declined to purchase the car. He asked the salesperson for the keys to his own automobile, which had been driven to another part of the dealership to be appraised for trade-in purposes. The consumer explained to the salesperson:

> It's getting late. My father is a heart patient. He's been in the hospital for 47 days. He's only been out about three weeks. He's on medication. . . . And we hadn't expected to be more than a couple hours when we left. We hadn't brought his medication with us and we had to get him home and get him on that.

The sales personnel refused to return his car. A staff member told the consumer his car was sold. He eventually was pressured into purchas-ing another used car. These negotiations lasted over 7 hours.

[5]RCW 62A.9-504(2), in part, provides:

"(2) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency."

Finally, North West sold its new and used cars for a higher gross profit than any other dealer in the Seattle area. In light of the above deceptive acts and practices, many of the consumers were charged unconscionable prices for North West automobiles.

The trial court ruled appellants flagrantly and intentionally engaged in the above deceptive acts and practices.[6] Substantial evidence supports these violations. The trial court assessed civil penalties against each appellant. The court found Williams liable for $279,000, RWI liable for $289,250, and North West liable for $289,250. The court also ordered each appellant to pay costs and attorney fees in the amount of $389,258.20. The court enjoined appellants from engaging in any of the above deceptive practices. Finally, the court entered a restitution order which required appellants to place $142,000 in a trust account for the purpose of restoring consumers' property in appellants' possession.

We also must describe in detail the complex interrelationship of appellants. Williams owned all of the stock in RWI and North West. RWI and North West are part of a corporate conglomerate which Williams characterized as "the world's largest car dealership." The directors and officers of RWI are also directors and officers of North

---

[6]Each of the above practices violated RCW 19.86.020, which provides: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

Alternatively, many of the practices did not meet the requirements of RCW 46.70 and RCW 63.14. Each television and newspaper advertisement violated RCW 46.70.180(1), which, in part, provides:

Each of the following acts or practices is hereby declared unlawful:

(1) To cause or permit to be advertised, printed, displayed, published, distributed, broadcasted, televised, or disseminated in any manner whatsoever, any statement or representation with regard to the sale or financing of a vehicle which is false, deceptive or misleading, . . .

RCW 63.14.020 required appellants to include the entire agreement in a single document. RCW 63.14.040 required appellants to make detailed disclosures within the sales contract. Appellants did not comply with either of these provisions. Also, the service charge in appellants' contracts exceeded the maximum amount allowable under RCW 63.14.130.

West. RWI is a management corporation which controls all of Williams' dealerships. North West conducted business in accordance with a management contract executed with RWI. A provision within the contract enabled RWI to receive fees for management services it never performed.

Williams managed and controlled both RWI and North West. Williams trained North West's general managers at one of his Southern California dealerships. The entire sales operation at the North West dealership was identical to the systems used at Williams' California dealerships. Williams also designed and produced North West's newspaper and television advertisements.

Williams and RWI made all decisions which concerned North West's financial affairs. The officers of RWI were authorized to sign checks and draw money out of North West's bank accounts. North West also provided RWI with interest-free loans. RWI loaned the money acquired from North West to other Williams' dealerships that were financially troubled. Williams opened a North West bank account in California with his name as the only signature on the account. Williams personally borrowed money from this North West California account. The money owed to North West by both Williams and RWI was repaid into this California account. The general manager of North West did not know about this California account. These repayments were not available to North West when it requested cash to pay its taxes in order to continue its operations. In fact, during the last months of 1970, North West sent its daily cash receipts to RWI. RWI supplied North West with the necessary capital to meet its daily operating expenses. All of this evidence clearly established that North West and RWI were part of a single financial entity owned, managed, and controlled by Williams.

As we have indicated, appellants appealed the trial court judgment. As a preliminary matter, we note that an appellate court possesses the inherent power to dismiss an appeal when a party disobeys certain trial court orders. *See Arnold v. National Union of Marine Cooks & Stewards Ass'n,*

42 Wn.2d 648, 257 P.2d 629 (1953), *aff'd*, 348 U.S. 37, 99 L. Ed. 46, 75 S. Ct. 92 (1954); *Pike v. Pike*, 24 Wn.2d 735, 740-43, 167 P.2d 401, 163 A.L.R. 1314 (1946); *cf. Helard v. Helard*, 22 Wn.2d 950, 155 P.2d 499 (1945). In this case appellants have refused to comply with the trial court's restitution order and its orders concerning ancillary proceedings. Nevertheless, we decline to exercise our discretionary dismissal power because of the nature and significance of the action.

We now proceed to the merits of this appeal. In their brief, appellants advance approximately 100 assignments of error which they consolidated into 13 alphabetical sections. Respondent's brief followed this organizational scheme. For purposes of clarity, this court will resolve each assignment of error as it appears in appellants' brief.

### Section A.

■ Appellants first challenge the issuance of the injunction. Appellants need a license to conduct an automobile business within Washington State, and they maintain the Director of the State Department of Motor Vehicles may refuse to renew their license. Appellants claim this represents an adequate remedy of law. We disagree. RCW 46.70.101[7] gives the director the discretionary power to grant or deny an automobile dealership license. The director is not required by law to reject appellants' license application. Further, the trial court did not enjoin appellants from engaging in the automobile business altogether. It enjoined them from engaging in future deceptive practices. A trial court should not deny equitable relief based on speculation that an administrative agency will exercise its discretionary power and deny appellants a license. Thus, the remedy asserted by appellants is uncertain and does not

---

[7]RCW 46.70.101, in part, states:

"The director may by order deny, suspend or revoke the license of any vehicle dealer, vehicle manufacturer, or vehicle salesman or, in lieu thereof or in addition thereto, may by order assess monetary penalties of a civil nature not to exceed one thousand dollars per violation, . . ."

bar appropriate equitable relief. *Davies v. Seattle*, 67 Wash. 532, 535, 121 P. 987 (1912).

Appellants also claim respondent did not enter proof of any commercial activity by appellants after December 1970. Appellants contend the need for injunctive relief is moot.

Cessation of illegal conduct does not deprive a tribunal of the power to hear and determine the case; *i.e.*, it does not render the case moot. A court may need to settle an existing controversy over the legality of the challenged practices. Also, if a court declares a case moot, a defendant may resume the prior illegal practices. Most courts refuse to grant defendants such a powerful weapon against public law enforcement. *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 97 L. Ed. 1303, 73 S. Ct. 894 (1953).

Nevertheless, the issuance of an injunction may be moot if the defendant can demonstrate that "events make it absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Courts place a heavier burden on parties alleging abandonment of practices where the practices are discontinued subsequent to institution of the suit. *State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 82 Wn.2d 265, 272, 510 P.2d 233 (1973); *see United States v. Oregon State Medical Soc'y*, 343 U.S. 326, 333, 96 L. Ed. 978, 72 S. Ct. 690 (1952). Courts must beware of efforts to defeat injunctive relief by protestations of reform. *United States v. Oregon State Medical Soc'y, supra.*

In the present case, appellants are free to continue business operations in the state of Washington. Absent an injunction, appellants may reenter the state and resume the identical deceptive practices. In light of the character of the past violations and this present ability to continue these practices, it is not absolutely clear appellants would refrain from future deceptive practices. Therefore, the trial court possessed the necessary power to hear the case and decide whether to grant injunctive relief.

This court may also review the trial court's decision to grant injunctive relief. The moving party, however, must demonstrate to the court the need for injunctive relief.

There must exist a cognizable danger of recurrent violation. The decision to grant or deny equitable relief is within the discretion of the trial court. The trial judge possesses broad discretion, and we will overturn the decision only if there is a strong showing of an abuse of discretion. *United States v. W.T. Grant Co., supra* at 633.

The record clearly establishes systematic and extensive deceptive sales practices. Appellants did not terminate these practices until after respondent filed its suit. In fact, they consistently denied the illegality of these practices and continued them for 2 months after the filing of respondent's suit. Appellants only ceased these practices because the Department of Revenue closed their dealership in December 1970. Appellants' past violations, the involuntary cessation of these violations, and their continuance in disregard of the lawsuit, all point to a danger of future violations. We deem injunctive relief appropriate, and we find no abuse of discretion by the trial court.

■ Appellants also maintain that the injunction constitutes an unwarranted interference with interstate commerce. U.S. Const. art. 1, § 8. Appellants did not present this issue to the trial court, and therefore it is not properly before this court. *See Talps v. Arreola*, 83 Wn.2d 655, 658-59, 521 P.2d 206 (1974).

*Section B.*

Appellants contend the trial court granted costs to respondent in violation of RCW 4.84.090.[8] RCW 4.84.090 does not apply to this action. The trial court awarded costs to

[8]"The prevailing party, in addition to allowance for costs, as provided in RCW 4.84.080, shall also be allowed for all necessary disbursements, including the fees of officers allowed by law, the fees of witnesses, the necessary expenses of taking depositions, by commission or otherwise, and the compensation of referees. The court shall allow the prevailing party all service of process charges in case such process was served by a person or persons not an officer or officers. Such service charge shall be the same as is now allowed or shall in the future be allowed as fee and mileage to an officer. The disbursements shall be stated in detail and verified by affidavit, and shall be served on the opposite party or his attorney, and filed with the clerk of the court, within ten days after the judgment: . . ." RCW 4.84.090.

respondent pursuant to RCW 19.86.080. This provision states that "the prevailing party may, in the discretion of the court, recover the costs of said action including a reasonable attorney's fee." The award of costs and attorney fees is consistent with this statutory directive.

■ Appellants claim their due process rights were violated because the trial judge awarded costs and attorney fees on the basis of respondent's 3-page affidavit. Appellants received a copy of the affidavit concerning costs and attorney fees almost 2 weeks before the hearing on the matter. Appellants made no request to examine any person or any document which concerned respondent's costs. Appellants clearly were given an opportunity to inquire into the specific details of the affidavit. Appellants chose not to raise any objections. We find no violation of the due process clause.

■ Appellants also maintain the award was excessive and punitive. The amount of allowable attorney fees and costs is within the discretion of the trial court. We will overturn the court's award only if there exists a manifest abuse of discretion. *St. Paul Fire & Marine Ins. Co. v. Chas. H. Lilly Co.*, 46 Wn.2d 840, 286 P.2d 107 (1955); *see* RCW 19.86.080. This litigation spans 4 years, two appeals, a number of extraordinary writs, and a 9-week trial. We consider the award reasonable in light of the duration and complexity of the suit. We find no abuse of discretion.

RCW 19.86.920[9] supports our approval of the costs and attorney fee award. This provision directs us to give the Consumer Protection Act a liberal construction. *Accord, Hockley v. Hargitt*, 82 Wn.2d 337, 350-51, 510 P.2d 1123 (1973); *see* Comment, *Reasonable Attorneys' Fees and Treble Damages—Balancing the Scales of Consumer Justice*, 10 Gonzaga L. Rev. 593 (1975). Such awards will encourage an active role in the enforcement of the Consumer Protection Act. This construction places the substantial costs of

---

[9]"To this end this act shall be liberally construed that its beneficial purposes may be served." RCW 19.86.920.

these proceedings on the violators of the act, and it does not drain respondent's public funds.

### Section C.

■ Appellants claim the imposition of civil penalties exceeded the relief sought in respondent's complaint. Pleadings are primarily intended to give notice to the court and adversary party of the general nature of the asserted claim. *Lightner v. Balow*, 59 Wn.2d 856, 858, 370 P.2d 982 (1962). The complaint contained the following paragraph in its prayer for relief:

F. That the court assess a civil penalty against each defendant of $2,000 for each and every violation of RCW 19.86.020 occurring after May 14, 1970, and before the date of final determination of this action, pursuant to RCW 19.86.130.

The reference in paragraph F to RCW 19.86.130, instead of RCW 19.86.140, the civil penalty section, represents a typographical error. This error did not prejudice appellants, as the remainder of the paragraph clearly gives notice to appellants that respondent sought an award of civil penalties. In fact, in *Seaboard Sur. Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc.*, 81 Wn.2d 740-41, 504 P.2d 1139 (1973),[10] we interpreted this complaint and stated:

The Attorney General's suit seeks to enjoin alleged "unfair methods of competition and unfair or deceptive acts or practices" and to *secure a judgment for penalties as provided in the Consumer Protection Act* (RCW 19.86),

. . .

(Italics ours.) *Accord, State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 82 Wn.2d 265, 268, 510 P.2d 233 (1973). Thus, appellants knew of the claim for civil penalties and opposed any imposition of penalties from the out-

---

[10]In *Seaboard Sur. Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc.*, 81 Wn.2d 740, 504 P.2d 1139 (1973), we interpreted an insurance contract and held that respondent insurer had no duty to defend appellants in this suit. Our *Seaboard* decision discusses a number of statutes in the Consumer Protection Act which are relevant to this appeal.

set of the suit. The trial court did not grant relief beyond the relief sought in the complaint.

*Section D.*

■ Appellants challenge the award of civil penalties. Specifically, appellants assert that civil penalties should be assessed on the basis of one penalty per consumer and not on the basis of one penalty per violation. *People v. Superior Court,* 9 Cal. 3d 283, 507 P.2d 1400, 107 Cal. Rptr. 192 (1973), a California Supreme Court decision, supports appellants' position. The court there interpreted similar statutory language and determined the number of violations by the number of aggrieved consumers. We decline to follow the one-violation-per-consumer rule.[11] RCW 19.86.140 pro-

---

[11]A close examination of *People v. Superior Court,* 9 Cal. 3d 283, 507 P.2d 1400, 107 Cal. Rptr. 192 (1973), will uncover the reason for the court's adoption of the one-violation-per-victim rule. The defendants in that case made 25 separate misrepresentations to each consumer in their door-to-door sales of encyclopedias. The trial court assessed a $2,500 penalty for each misrepresentation. The court was particularly concerned with the severity of the judgment and its future economic effect. Each encyclopedia sale resulted in a $62,500 penalty. In order to limit the maximum amount of penalties, the trial court adopted the one-penalty-per-victim rule. The court stated that "it is unreasonable to assume that the Legislature intended to impose a penalty of this magnitude for the solicitation of one potential customer." *People v. Superior Court, supra* at 289. However, the court overlooked an alternative approach. The Cal. Bus. & Prof. Code, § 17536(a) (West Supp. 1975), states: "(a) Any person who violates any provision of this chapter * * * shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, . . ." The trial court automatically assessed the maximum amount for each misrepresentation. If the court considered the total amount of penalties too oppressive, it could have reduced the individual penalty for each misrepresentation.

The trial court in the present case did not automatically assess the maximum amount for each violation. The penalties were based on the seriousness of each violation. The judgment included penalties of $250, $500, and $2,000.

Our interpretation of RCW 19.86.140 gives the provision its needed flexibility and is also consistent with RCW 19.86.920, which declares:

[T]he purpose of this [consumer protection] act is . . . to protect the public and foster fair and honest competition. . . . To this end this act shall be liberally construed that its beneficial purposes may be served.

*See Hockley v. Hargitt,* 82 Wn.2d 337, 350-51, 510 P.2d 1123 (1973).

vides: "Every person who violates RCW 19.86.020 shall forfeit and pay a civil penalty of not more than two thousand dollars *for each violation.*" (Italics ours.) This statute vests the trial court with the power to assess a penalty for each violation. The violations in this case fall within 10 separate classifications, and each classification represents a distinct and separate cause of action. Each cause of action required respondent to prove divergent facts to establish a violation.[12] Therefore, we hold that each cause of action is a separate violation of the Consumer Protection Act.

▇▇ Appellants attack the imposition of civil penalties, because the trial court did not find that the consumers relied on appellants' wrongful conduct. A claimant need not prove consumer reliance to establish an unfair or deceptive practice. A claimant must prove that the conduct has the capacity or tendency to deceive. *Vacu-Matic Carburetor Co. v. Federal Trade Comm'n,* 157 F.2d 711 (7th Cir. 1946), *cert. denied,* 331 U.S. 806, 91 L. Ed. 1827, 67 S. Ct. 1188 (1947); *see* Comment, *Toward Effective Consumer Law Enforcement: The Capacity to Deceive Test Applied to Private Actions,* 10 Gonzaga L. Rev. 457 (1975). Respondent clearly met this proof requirement.

Appellants also maintain the penalty assessment is inconsistent with the trial court's findings of fact. We disagree. The court imposed penalties against each appellant on the basis of the specific findings of fact concerning liability. Substantial evidence supports these findings, and we find no error in the assessment of penalties.

▇▇ Appellants contend their liability for penalties should be joint and not individual. This argument ignores

---

[12]A single advertisement may include a number of misrepresentations. For example, some of appellants' advertisements included price misrepresentations and false statements concerning easy credit terms. Respondent established price misrepresentations by presenting evidence which proved that appellants' prices were higher than their advertised prices and higher than their competitors' prices. Respondent established the credit misrepresentations by presenting evidence that appellants required higher down payments and higher monthly payments than their advertised credit terms. Each of these acts is a separate violation of RCW 19.86.020.

the clear statutory directive of RCW 19.86.140, which states that "[e]*very person* who violates RCW 19.86.020 shall forfeit and pay a civil penalty . . ."[13] (Italics ours.)

### Section E.

▇▇▇ The trial court based a number of penalty assessments on audio portions of certain television commercials. Appellants claim exhibits 4.1 through 4.10 were inadmissible because respondent did not present any witness who observed the taping of the commercials. Federal law requires a television station to keep these audio tapes in the regular course of business. The custodian of the records identified the tapes. He also described the mode of preparation. These tapes were properly authenticated and admissible under RCW 5.45.020 as business records.[14]

▇▇▇ Appellants also assign error to the trial court's decision to admit the audio portions of the commercials without the video portions of the tapes.[15] The trial court repeatedly asked appellants to explain the prejudicial effect of the failure to admit the video portions of the tapes. Appellants failed to establish any prejudice. The video portions of the tapes would not alter appellants' audio misrepresentations. The audio misrepresentations were independent of the video portions of the tapes. We find no error in the failure to produce the video portions of the tapes.

▇▇▇ Appellants' final argument with regard to the audio tapes is without merit. Appellants contend the admission into evidence of these tapes renders the Consumer Protection Act unconstitutionally vague as it is applied. In

---

[13]RCW 19.86.010 (1) defines "person" as "natural persons, corporations, trusts, unincorporated associations and partnerships."

[14]"A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." RCW 5.45.020.

[15]The television station is not required by law to keep the video portions of the commercials in the regular course of business.

*State v. Ralph Williams' North West Chrysler Plymouth, Inc., supra* at 279, we clearly held:

> [T]he phrases "unfair methods of competition" and "unfair or deceptive acts or practices" have a sufficiently well established meaning in common law and federal trade law to meet any constitutional challenge of vagueness.

### Section F.

 Appellants assert that the order of restitution violates RCW 19.86.080. This section vests the trial court with the discretionary power to "make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any act herein prohibited or declared to be unlawful." In *State v. Ralph Williams' North West Chrysler Plymouth, Inc., supra* at 277, we discussed the purpose of this statute.

> Suits for injunctive relief and restitution enforce the laws of the particular jurisdiction in the public interest by restoring the status quo. Restitution orders are appropriate and necessary as a part of equitable relief. . . . The recovery of that which has been illegally acquired and which has given rise to the necessity for the injunctive relief not only restores the property to the party but insures future compliance where it is assured a wrongdoer is compelled to restore illegal gains.

(Citations omitted.) Also, in *Seaboard Sur. Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc.*, 81 Wn.2d 740, 746, 504 P.2d 1139 (1973), we described a number of practices which, if proven, warrant restitutory relief.

> Among the practices of the defendants of which the Attorney General complains are these: Obtaining possession of a customer's automobile prior to or during negotiations and then refusing to return it if the negotiations were unsuccessful; failing to account to the original buyers for excess money received in resales of repossessed cars; and failure to refund to customers unearned insurance premiums. In proving each of these allegations, the Attorney General would be expected to show specific instances of such practices; the identity of the automobile or the amount of money unlawfully withheld would be

customarily shown as a part of that proof. No further proof would be necessary in order to justify the court in ordering restitution.

Respondent met the requisite proof requirements. The record indicates that appellants are in unlawful possession of consumer money and property. For example, appellants did not return the resale profits on repossessed cars. Many consumers paid excessive rates for credit life and disability insurance. Appellants also charged unconscionable prices for a number of their automobiles. Thus, substantial evidence supports the trial court's decision to award restitutory relief.

Appellants claim the restitution order violates their due process rights. The order directs each appellant to take certain steps to accomplish the appropriate restoration of funds. The order also establishes an efficient procedure to allow appellants to challenge each consumer claim. Appellants may challenge each restitution award before a court-appointed master and ultimately before the trial court. Other courts have sanctioned similar restitution orders. *See, e.g., Commonwealth v. DeCotis*, ............ Mass. ............, 316 N.E.2d 748 (1974). The restitution order satisfies the requirements of the due process clause.

■■■ This restitution order does not create a class action for damages and subject appellants to double liability. In *Seaboard Sur. Co. v. Ralph Williams' Northwest Chrysler Plymouth, Inc., supra* at 744-46, we stated the difference between restitutory relief and damages.

It is true that a court may award damages in lieu of an injunction in a proper case, and it may award damages in addition to an injunction, in order to accord the plaintiff full relief. However, as we read the statutes which authorize the Attorney General's action in this case, the legislature did not contemplate that the courts should inquire into the question of damages in an injunction action by the Attorney General. If the legislature considered that the state might be damaged by the acts complained of, it determined in advance the measure of "damages" insofar as the state was concerned and provided for those damages in the civil penalty section,

RCW 19.86.140. It also provided a remedy for private persons injured in their business or property in RCW 19.86.090. The loss of profits occasioned by "unfair methods of competition," assuming such a loss can be shown, is such an injury.

. . .

On the other hand, in a suit such as the Attorney General's, proof that the defendants have acquired possession of and are holding property of a customer unlawfully can be reasonably expected as part of the proof of the allegations of unfair and deceptive acts and practices (which also incidentally might constitute "unfair methods of competition"). Where these facts are shown, the court can order restitution without the necessity of hearing additional evidence.

(Footnote omitted.)

In its order, the trial court recognized this difference between restitution and damages when it provided: "Nothing in this order shall be construed to bar any consumer from pursuing any other available remedies." There exists no possibility of double recovery. Each aggrieved consumer may sue appellants and recover proven damages in addition to any restitutory award.[16]

The restitution order applies to all aggrieved consumers. It is not limited to the consumers who testified at trial. *See* Reed, *Consumer Protection in Washington: An Overview*, 10 Gonzaga L. Rev. 391, 403-04 (1975). RCW 19.86.080 directs the court to restore *"to any person . . .* property, real or personal, which may have been acquired by means of any act herein prohibited or declared to be unlawful." (Italics ours.) To limit restitution to the consumers who testified at trial would unduly complicate future consumer protection trials. Consumer witnesses would recount repetitious claims of deceptive practices and prolong the litigation.

### Section G.

The trial court refused to pierce the corporate veil and

---

[16]The final judgment in this case shall be prima facie evidence in a private action for damages by a consumer under RCW 19.86.090. RCW 19.86.130.

hold appellant Williams liable on an "alter ego" theory for the actions of North West. Appellants assign error to the trial court's decision to retain appellant Williams in the suit after determining he was not liable on an alter ego theory. The alter ego theory is not the only one advanced by respondent to hold appellant Williams liable for the deceptive practices. The respondent sought to hold Williams independently liable for his role in formulating and supervising the dealership's unlawful activities. The complaint alleges that Williams "controls, directs and formulates the policies and activities [of North West]." The record supports the trial court finding that Williams was personally responsible for many of the unlawful acts and practices of North West.

Appellant Williams' liability is individual, not joint or cumulative. If a corporate officer participates in the wrongful conduct, or with knowledge approves of the conduct, then the officer, as well as the corporation, is liable for the penalties. *See Johnson v. Harrigan-Peach Land Dev. Co.,* 79 Wn.2d 745, 489 P.2d 923 (1971). Corporate officers cannot use the corporate form to shield themselves from individual liability. *Johnson v. Harrigan-Peach Land Dev. Co., supra* at 752.

### Section H.

The trial court held RWI liable on an alter ego theory for certain practices utilized by North West.[17] Appellants challenge the use of the alter ego theory as it applies to RWI. However, we need not reach this issue. The record clearly supports the finding that RWI individually participated in the deceptive acts and practices. North West conducted its operation in accordance with a management contract with RWI. Williams and RWI implemented and supervised the entire North West sales operation. Also, RWI made all decisions concerning North West's financial affairs. RWI is personally responsible for the activities of North West and its sales personnel.[18]

---

[17]The trial court only utilized the alter ego theory to find RWI liable for the deceptive practices in findings of fact Nos. 47 through 75.

[18]The trial court's findings of fact and conclusions of law support our interpretation.

"Defendants Ralph Williams, RWI and RWNWCP [North West]

## Section I.

■ Appellants contend their newspaper advertisements did not violate RCW 46.70.180. The trial court found appellants' advertising to be intentionally deceptive, misleading, and patently false. These advertisements clearly violated RCW 46.70.180(1). Substantial evidence supports these violations. *See Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959).

## Section J.

■ Appellants maintain the trial court improperly admitted exhibit 278 into evidence. Appellants apparently argue that exhibit 278 represents incompetent evidence of the profits made on the sales of repossessed automobiles. In *Keen v. O'Rourke,* 48 Wn.2d 1, 5, 290 P.2d 976 (1955), we held:

> Where a fact or facts can be ascertained only by the inspection of numerous books and records, which are themselves proper evidence, and the jury cannot satisfactorily nor conveniently examine the same in court, a qualified person, who has perused the entire mass, may state the result of his examination and use a summary of it to illustrate his conclusion.

(Citation omitted.)

Mr. David Hill, respondent's investigator, testified he made a simple but exhaustive study of appellants' consumer records or "deal files" with regard to credit sales in which there was a repossession and subsequent sale. This

---

individually controlled, directed, participated in, formulated the policies relating to, had knowledge of, and benefited from the acts and practices described in paragraphs 14 through 57." Finding of fact No. 12.

"The acts and practices described in paragraphs 59 through 75 were engaged in by employees and representatives of RWNWCP as agents of the dealership. Since the entire organization of corporations [was] purportedly run under a management contract with RWI, . . . RWI and RWNWCP must each be responsible for these acts and practices." Finding of fact No. 13.

"Defendant RWI is responsible for the acts and practices of defendant RWNWCP." Conclusion of law 3.

"Defendants and each of them have engaged in the practices set forth in paragraphs 20 through 57 above." Conclusion of law 28.

"Defendants RWI and RWNWCP have engaged in the practices set forth in paragraphs 20 through 76 above." Conclusion of law 29.

study presented numerous occasions in which the dealership made a profit on repossession sales after deducting the allowable costs of resale. This profit was never returned to the consumer whose car had been repossessed, nor was there even a procedure set up to do so. RCW 62A.9-504 requires appellants to return this profit to the consumers. Exhibit 278 represents an admissible summary of the violations of this provision.[19]

### Section K.

Appellants contend that the trial court erroneously assessed penalties for violations of RCW 63.14.020, .030, and .130. We need not decide this issue. The trial court imposed penalties pursuant to RCW 19.86.140, not RCW 63.14.

### Section L.

The final assignments of error concern respondent's cross-appeal. Respondent claims appellants deceived consumers when they did not advise them of the availability of joint credit life policies. The trial court did not recognize liability in this regard.

Joint credit life policies are available in this state and are sold to two individuals who are obligated on the same contract. Appellants sold two separate insurance policies to the primary debtor and the cosigner at a cost of 1½ times that of the joint policy. RCW 48.34.050 and .070[20] do

---

[19] In *State v. Reader's Digest Ass'n*, 81 Wn.2d 259, 276, 501 P.2d 290 (1972), we held "that an act which is illegal and against public policy is per se unfair within the meaning of RCW 19.86.020." *See* Comment, *State v. Reader's Digest Ass'n—A Knockout Punch to Unfair or Deceptive Acts or Practices in Washington?*, 10 Gonzaga L. Rev. 529 (1975). A violation of RCW 62A.9-504 is illegal and against public policy. Therefore, the failure to return profits from repossession sales constitutes a violation of RCW 19.86.020.

[20] "The initial amount of credit life insurance under an individual policy shall not exceed the total amount repayable under the contract of indebtedness. Where an indebtedness is repayable in substantially equal installments, the amount of insurance shall at no time exceed the scheduled or actual amount of unpaid indebtedness, whichever is greater." RCW 48.34.050.

"The total amount of periodic indemnity payable by credit accident and health insurance in the event of disability, as defined in the policy, shall not exceed the aggregate of the periodic scheduled unpaid installments of the indebtedness; and the amount of such periodic indemnity

not specifically prohibit the sale of individual policies to two obligors on the same contract. However, the mere fact that appellants did not advise consumers of the availability of the joint policy constitutes a deceptive practice under RCW 19.86.020. Also, this conduct violates RCW 48.01.030, which states:

The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, and their representatives rests the duty of preserving inviolate the integrity of insurance.

We, therefore, affirm the trial court judgment regarding appellants' appeal and reverse and remand the trial court's judgment regarding respondent's cross-appeal.

ROSELLINI, HUNTER, UTTER, BRACHTENBACH, and HOROWITZ, JJ., concur.

STAFFORD, C.J. (concurring)—I agree with the majority opinion reached on the merits. Nevertheless, I am convinced that the expenditure of appellate resources was an unnecessary waste of judicial time. The consolidated appeal should have been dismissed pursuant to ROA I-51.

An appellate court has the inherent power to dismiss an appeal when a party disobeys the orders of a trial court. *Arnold v. National Union of Marine Cooks & Stewards Ass'n*, 42 Wn.2d 648, 257 P.2d 629 (1953), *aff'd*, 348 U.S. 37, 99 L. Ed. 46, 75 S. Ct. 92 (1954); *Pike v. Pike*, 24 Wn.2d 735, 740-43, 167 P.2d 401, 163 A.L.R. 1314 (1946). Whether considered singularly or collectively, this consolidated appeal and the contempt action filed in today's accompanying opinion, *State v. Ralph Williams' North West Chrysler Plymouth, Inc.*, 87 Wn.2d 327, 553 P.2d 442 (1976), represent the most flagrant disregard and contemptuous disobedience of a trial court's orders that I have witnessed. The actions which caused us to dismiss the appeal in *Arnold* are pale by comparison.

---

payment shall not exceed the original indebtedness divided by the number of periodic installments." RCW 48.34.070.

Appellants have paid no part of the civil penalties or attorneys' fees assessed against them by the trial court. They have willfully refused to comply with orders pertaining to ancillary proceedings, restitution, and the establishment of a trust account to protect citizens of this state who were victims of appellants' unfair and deceptive acts and practices.

Appellants have made no attempt to explain their failure to comply with the court's orders. They have secreted and manipulated assets to keep them out of the jurisdiction of the courts of this state. Further, they have flaunted the directions of the trial court by refusing to participate in ordered discovery proceedings and to produce documents needed to discover assets. In contrast, the trial court has given appellants additional time to comply with its orders and to purge themselves of contempt. Appellants' response to these periods of grace has been only contemptuous refusal to comply.

At no time have the appellants attempted to supersede the trial court's orders, as authorized by court rule. As a result, they are obliged to comply. *Ryan v. Plath*, 18 Wn.2d 839, 855, 140 P.2d 968 (1943); *Sewell v. Sewell*, 28 Wn.2d 394, 396-97, 184 P.2d 76 (1947). Because appellants have willfully delayed and refused to comply with the prior orders of the trial court, it is now time for us to punish them for their constant and flagrant disobedience by dismissing their appeal without considering the merits, as we did in *Arnold v. National Union of Marine Cooks & Stewards Ass'n, supra.*

Dismissal is a strong sanction, but appellants' willful and continuously contemptuous actions call for strong measures. I would have dismissed the matter without further waste of judicial time and effort.

WRIGHT, J., concurs with STAFFORD, C.J.

Petition for rehearing denied September 16, 1976.